Tora C. BRENNAN, Plaintiff-Appellee,

v.

**MIDWESTERN UNITED LIFE INSUR-
ANCE COMPANY, a corporation,
Defendant-Appellant.**

No. 17167.

United States Court of Appeals
Seventh Circuit.

Sept. 29, 1969.

Rehearing En Banc Denied
Nov. 5, 1969.

Morgan, District Judge, dissented.

See also, D.C., 259 F.Supp. 673.

**148**

Albert E. Jenner, Jr., John C. Tucker, David C. Roston, Chicago, Ill., G. R. Redding, John L. Woolling, Indianapolis, Ind., Gilmore S. Haynie, Fort Wayne, Ind., for defendant-appellant.

Charles B. Feibleman, Sidney Mishkin, Indianapolis, Ind., for plaintiff-appellee; Bamberger & Feibleman, Indianapolis, Ind., Robert L. Kaag, Fort Wayne, Ind., of counsel.

Before SWYGERT and CUMMINGS, Circuit Judges, and MORGAN, District Judge.[1]

SWYGERT, Circuit Judge.

This is an appeal from a judgment granted the plaintiff in a class action against the defendant, Midwestern United Life Insurance Company, on behalf of all persons who bought Midwestern stock from Dobich Securities Corporation but failed to receive delivery of their stock.

Midwestern is an Indiana corporation with its principal place of busines in Fort Wayne, Indiana. During the period in question it had a million shares of stock outstanding and over 10,000 stockholders.

Dobich Securities Corporation was incorporated in Indiana in 1963. Michael Dobich owned most of the stock of the corporation and was its president, chief executive officer, and in control of its operations. Dobich Securities' operations were entirely intrastate and under the regulations of the Indiana Securities Commission.

The district court held that Dobich Securities and Michael Dobich violated Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 of the Securities Exchange Commission in the sale .of Midwestern stock and that Midwestern aided and abetted those violations by both affirmative conduct and silence and inaction after November 30, 1964. The court further held that Midwestern's conduct was a proximate cause of the loss sustained by those who purchased Midwestern stock from Dobich Securities on or after December 1, 1964 and did not receive delivery of their stock.

1. Judge Robert D. Morgan is sitting by designation from the United States District Court for the Southern District of Illinois.

The principal issue before us is whether the record supports certain findings made by the trial judge, namely, that Midwestern's president, Phil J. Schwanz, and its general counsel, Ralph Sheets, knew prior to November 30, 1964 that "Dobich was dealing in a fraudulent manner with his customers' money," thus violating the securities laws; thereafter Midwestern intentionally aided and abetted Dobich in order to gain a benefit for itself; and there was a causal relation between Midwestern's conduct and the loss suffered by the plaintiff and the other purchasers of Midwestern's stock who were similarly situated. Two other issues were presented: whether Midwestern had a duty to report Dobich's activities to the Indiana Securities Commission, and whether Midwestern's affirmative conduct, as opposed to silence and inaction, was an issue raised either by the pleadings or tried with the consent of the parties.

With respect to the principal issue our duty is to decide whether the trial judge's findings were clearly erroneous. As stated by many other reviewing courts, we, as an appellate tribunal, may not retry the case or substitute our judgment for that of the trial judge. It is he, who after judging the credibility of the witnesses, weighing the evidence, and drawing inferences, makes factual determinations. Our function is to ascertain, after considering the record in its entirety, whether the inferences drawn by the trial judge have a sufficient evidentiary basis so that it can be said they are reasonable, that is, could have been arrived at by logical deduction. In performing that function, we may not resolve testimonial conflicts or attempt to judge the credibility of witnesses.

The knowledge, motive, design, and intent which underlay the actions of a number of people in this case had to be determined by the trial judge. Such determinations are seldom made on the basis of direct proof. More often they are arrived at by inference from indirect evidence and after the trier of fact has judged the credibility of the witnesses. The latter was the situation in the present case. Judge Eschbach was well aware of this as indicated by one of the concluding paragraphs in his memorandum opinion which accompanied the district court's decision holding Midwestern liable.[2] He wrote:

This long and detailed account of MULIC's activities as they related to Dobich Securities Corporation has been necessary because only from an assimilation of a large number of small incidents can ultimate conclusions about MULIC's knowledge and conduct be derived. The unusual facets of this case will be observed in the unique facts and surrounding circumstances which have been disclosed by the evidence and not in any unusual application of legal principles. It is for this reason that an unusually long and detailed statement of facts has been required. No one incident or witness has provided a complete picture of the relevant facts and circumstances. An accurate understanding of MULIC's knowledge and conduct can be derived only from a chain of factors disclosed by many witnesses, exhibits, and stipulations. This case clearly demonstrates that the limits of duties prescribed by the Securities Exchange Act of 1934 ' * * * cannot be confined to an abstract rule but must be fashioned case by case as particular facts dictate.' Kohler v. Kohler Co., 319 F.2d 634, at 637–638, 7 A.L. R.3d 486 (7th Cir.1963).

We cannot agree with Midwestern's argument that the vast majority of the evidence is undisputed and therefore we are free to draw our own inferences regardless of those drawn by the trial judge. Although much of the evidence

---

2. The memorandum of decision is published in full, Brennan v. Midwestern United Life Ins. Co., 286 F.Supp. 702 (N.D.Ind.1968).

is either documentary or relates to undisputed events, the import of this evidence was passed upon by the judge in the light of the testimony of witnesses, both interested and disinterested. Accordingly, credibility determinations were a significant part of the inferences which he drew from the primary facts and testimony. To be expected, Midwestern's defense was to deny any wrongdoing; however, it is evident that the trial court judged the defendant's actions in the light of all the evidence, testimonial and documentary, rather than accepting at face value the self-serving tesitmony of certain witnesses.

With the foregoing approach in mind, we have considered the record as well as the contentions and arguments advanced by the parties. Although many of the arguments made by Midwestern to demonstrate that the evidence supports findings other than those made by the trial judge are persuasive, the counterarguments made by the plaintiff in favor of the district court's finding are equally so. This is a close case, but our ultimate conclusion is that, on balance, we cannot say that the factual determinations made by the district judge are clearly erroneous.

We believe it would not only unduly lengthen this opinion but would serve no useful purpose to recite in detail the evidentiary background of this case. That background is contained in Judge Eschbach's exhaustive memorandum decision to which we have referred. Rather we shall point out the more important reasons why we think there is sufficient evidentiary support for findings which Midwestern says are erroneous.

I. *Midwestern's knowledge that Dobich was violating the Securities laws*

█ The district judge found that "Schwanz and Sheets knew well before November 30, 1964 that Dobich was dealing in a fraudulent manner with his customers' money." We believe that a number of events and circumstances (many of them alluded to in the district judge's opinion) when considered in combination support this finding.

Schwanz and Sheets knew by reason of the Dellwo incident[3] in May 1964 that Dobich was selling Midwestern stock to his customers and that through one of his salesmen, he had made a number of misrepresentations. In September 1964 they became aware through four complaints from customers of Dobich that his delivery of Midwestern stock was abnormally delayed. As a result, they discussed the possibility that Dobich was using his customers' money as working capital. After September 28 Sheets wrote Dobich that "It appears that you are using your clients' money as working capital, which should not be done." Sheets also expressed concern that Dobich's customers might feel Midwestern was responsible if Dobich was "unable to make good on its obligations to transfer MULIC stock." Dobich responded to this letter by writing to Sheets, "We have developed a substantial interest in your company." He asked for a meeting with Schwanz and Sheets. The meeting occurred on October 12, 1964. Prior to that another Dobich customer complained to Midwestern that he had purchased $7,500 worth of its stock in July and had not yet received a stock certificate. At the meeting Dobich told Schwanz and Sheets that he had stock to deliver, but that his late delivery of Midwestern stock to his customers was caused by the difficulty he was experiencing in getting the stock released from collateral and from other brokers from whom he had purchased Midwestern stock. No attempt was made by Schwanz to verify this explanation although Sheets on the witness stand inferentially admitted the unlikelihood of the story about difficulty with releases of collateral. Schwanz' testimo-

3. The Dellwo affair is discussed at length in the district court's opinion at 286 F.Supp. 702, 708–709.

ny revealed his awareness of Dobich's late deliveries:

> I can tell you about what he [Dobich] said. "As you know we're selling a lot of your stock." And I said, "Well, you probably are, but I still want fast deliveries. I want deliveries to be normal. I do not want them to be slow." * * * "I don't care what you are selling, its got to be done right or not at all."

In recalling the meeting with Dobich on October 12, Schwanz testified with respect to giving Dobich a two-week deadline period, Dobich had said, "In two weeks time I can be even with the board."

The day following the meeting Sheets wrote to Dobich:

> This will confirm our understanding that within two weeks you will have caused Midwestern United Life Insurance Company stock to be transferred to any persons who have purchased such stock through or from you.
>
> If we receive information after two weeks from now that you are not making transfers to purchasers of MULIC stock within the normal time required of a broker to effect such transfers, we will have to refer future inquiries to the Indiana Securities Commissioner for suitable investigation.

On October 15 two more complaints from Dobich's customers were received by Midwestern. To one, Dobich explained that the stock was in "inventory and any delay in its delivery would be the fault of Midwestern United Life." To the other, he said that he did not want to flood the market with Midwestern stock. Midwestern officials could not help but realize that these explanations were false and they admitted as much on the witness stand. Moreover, they were completely inconsistent with his story to Sheets and Schwanz on October 12. As plaintiff argues, a broker who is not converting his customers' money does not make flagrantly false misrepresentations to his customers concerning his failure to make delivery of

their stock certificates. A third complaint, from George W. Puetz, was received by Midwestern on October 15. Puetz said that stock purchased in June had not yet been delivered. He did not identify the broker from whom he purchased the stock. However, a blind copy of Midwestern's reply to Puetz was sent to Dobich as well as to Sheets.

We believe the foregoing recital of events could reasonably permit the trial judge to find that Midwestern officials knew Dobich was misusing his customers' money, that is, that he was selling Midwestern stock which he did not own and did not then have funds to purchase.

## II. *Midwestern's aiding and abetting Dobich's fraudulent actions and its motive for doing so*

The price of Midwestern stock rose rapidly during the last half of 1964. From $69 per share in June there was an increase to $93 per share in December. Dobich Securities presented to Midwestern for transfer approximately twenty-one per cent of the total shares presented for transfer by all brokers from May 1964 until July 1965. The market was thin in Midwestern stock and the effect of the Dobich Securities' buying was to drive up the price of the stock. This seems to have been a substantial reason for the rise in price since Midwestern's earnings for 1964 were less than they were in 1963. Midwestern's officers knew that Dobich was largely responsible for the increased activity in Midwestern's stock and that this had an effect on the price.

On October 27, 1964 merger negotiations began between Midwestern and the Illinois Mid-Continent Life Insurance Company. An agreement was reached the next day that one share of Midwestern stock would be exchanged for ten shares of Mid-Continent stock. Mid-Continent was quoted at $9.50 per share and Midwestern at $88. The ten-for-one exchange ratio was based primarily on the then market price since the adjusted book values of the two companies did

not support the exchange ratio agreed upon.

The Mid-Continent stockholders, after a proxy contest, refused to approve the merger in February 1965. During the proxy fight the officers of Mid-Continent argued that, "The adjusted book value of the share has little relationship to the value of the shares in that the value of the shares is primarily established by the market value in over-the-counter trading."

Schwanz admitted that it would have been embarrassing for Midwestern if the SEC or the Indiana Securities Commission had investigated Dobich while they were in the middle of the proxy fight in Chicago. He also admitted that if Dobich Securities had been put out of business in November or December 1964, there could have been a serious decline in the bid and asked price of Midwestern stock.

The district court found that a pronounced change in Midwestern's attitude took place between October 13 (when Sheets wrote Dobich that, if Midwestern received any information after two weeks about Dobich's late delivery of stock, future inquiries would be referred to the Indiana Securities Commission for "suitable investigation") and November 30. We are convinced that the court was justified in adopting such a view.

After receiving the October 13th letter, Dobich sent lulling telegrams and letters to his customers who had purchased Midwestern stock but had not received their certificates. A typical telegram read in part: "Midwestern United Life has made a nice move upward. Dobich Securities Corporation has worked hard to alert the public to this situation. If you are late receiving your certificate, do not be alarmed. We are now solving that problem." A typical letter read in part:

Please do not become alarmed if delivery is made later than usual because we are creating a heavy interest in this particular stock. The unusually large volume has two effects; it makes our processes a little slower and at the same time, it causes your holdings to increase in value.

This maneuver by Dobich apparently worked for a time because Midwestern received no complaints between October 15 and November 23.

On November 23 Robert Dillon was visited by two Midwestern agents. Dillon had purchased 200 shares of Midwestern stock in September 1964. Some time later he received one of the lulling telegrams and a follow-up letter. Dillon inquired of the agents how long it took to transfer Midwestern stock. He did not identify the broker from whom he had made his purchase; however, one of the agents said, "I hope you are not talking about Mr. Dobich." The agent immediately called Schwanz who then discussed the matter with Sheets. Thereafter, on November 30, Sheets wrote two letters, one to Dillon and the other to Dobich. The letter to Dobich read in part:

We are suggesting to Mr. Dillon that, in the event he does not receive his stock immediately or does not receive a satisfactory explanation for the delay, he turn the matter over to his personal attorney and/or contact the Indiana Securities Commissioner.

Dillon received a carbon copy of this letter along with a letter suggesting that if he did not hear from Dobich "right away," he should contact either the Indiana Securities Commissioner or his personal attorney.

The same procedure was followed with reference to a complaint sent to Midwestern on November 30 by Frederick Volkee except that Dobich was sent a blind carbon copy of Midwestern's response to the complaining customer.

With respect to complaints received from Dobich's customers after December 1, 1964, Midwestern followed a procedure which effectively foreclosed the possibility that complaining customers would proceed before the Indiana Securities Commission. Those who inquired about the delay in the delivery of their

stock from Dobich were advised to first contact Dobich Securities. Some were further advised to proceed before the Indiana Securities Commissioner if a satisfactory explanation or delivery was not made by Dobich. Midwestern's letters were a signal to Dobich. They directed customers to contact Dobich and thus allowed him to arrange for delivery without fear of any Indiana Securities Commission interference.

We agree with the district judge's appraisal of the Dillon letter on November 30. Judge Eschbach's memorandum opinion on this matter read:

> Sheets' letter to Dobich on November 30 * * * gave Dobich an opportunity to deliver to Dillon and keep Dillon away from the Securities Commission. It must be remembered that until this time, Dobich had no reason' to think that if a complaint about late delivery came to MULIC, MULIC would do anything less serious (from Dobich's point of view) than forward the inquiry directly to the Indiana Securities Commission. It is reasonable to conclude that Dobich, until this time, had good cause to fear that MULIC might even take its whole history of complaints to the Commission. Dobich had tried at the October 12 meeting to convince Schwanz and Sheets that he was worth protecting, but up until November 30 Dobich had no reason to suspect that his efforts had been successful. So it much have come as an extremely pleasant surprise to Dobich to learn that so long as he delivered Dillon's shares, MULIC would keep still. Nowhere in his letter did Sheets suggest that Dobich was appropriating his customers' money or that his conduct was improper or that Dobich was giving MULIC a bad name. In short, all the expressions of generalized concern about Dobich's activities, so evident in the letters of September 28 and October 13 and in the meeting of October 12, were gone. In their place was a letter indicating that so long as the *particular* complaint was satisfied, MULIC had no further concern.

We also agree with the judge's view that Dobich would interpret the Dillon letter to mean that Midwestern did not intend to carry out its threat to refer future inquiries to the Indiana Securities Commission; rather, that Midwestern would give him an opportunity to continue in business so long as he satisfied complainants by prompt delivery of their stock. Further, it is reasonable to infer that Sheets must have known Dobich would interpret the Dillon letters in this fashion.

The reason for this change of attitude on Midwestern's part is not hard to guess. Midwestern was trying to accomplish the Mid-Continent merger. It was to Midwestern's advantage to keep its stock at the price it was selling for in November and December. If the price declined, the success of the merger was endangered since the merger was based upon the relative market values of the two stocks. The rise in price of Midwestern's stock had been generated by Dobich's abnormal selling activities which in turn required him to cover his short sales in a thin market. If Dobich's operations were reported either to the Indiana Securities Commission or the SEC by Midwestern, those operations would undoubtedly have come to an end and the prop holding up the price of Midwestern's stock would no longer exist.

We believe that the district judge could reasonably reach this conclusion after considering all the evidence. We also believe that it was reasonable to conclude further that the procedure adopted in the Dillon matter and thereafter encouraged Dobich "to continue his activities without fear of a report from MULIC to the Indiana Securities Commission," and that this encouragement substantially aided and abetted Dobich in the continuation of his fraudulent operations after December 1, 1964. We think it was also reasonable to conclude that Midwestern aided Dobich in

the continuation of his fraudulent activities by not carrying out its threat contemplated in its October 13th letter and by its failure to report either to the Indiana Securities Commission or the SEC its knowledge of Dobich's activities after realizing that Dobich did not intend "to be even with the board" as he promised. Under the circumstances, this calculated silence constituted part of Midwestern's plan to aid and abet Dobich in his fraudulent activity.

### III. *The causal connection between Midwestern's misconduct and the injury suffered by the members of the class*

The district court found that except for either Midwestern's misconduct in actively assisting and encouraging Dobich commencing with issuance of the Sheets' letter on November 30, 1964 or its failure to report Dobich's activities to the Indiana Securities Commission, Dobich would have ceased his fraudulent activities on December 1, 1964 or would have been forced to do so by actions of the Securities Commissioner on December 21, 1964. As we previously stated, it is our view that the district court was justified in its interpretation of the November 30 letter as indicating Midwestern's intention not to refer inquiries directly to the Indiana Securities Commission so long as the specific complaints about tardy delivery received by Midwestern were satisfied by Dobich. By referring directly to Dobich the complaints of dissatisfied customers who potentially could filed charges before the Securities Commission, the possibility that the Securities Commission would interfere was substantially reduced. This affirmative conduct on Midwestern's part facilitated the commission of Dobich's fraud because it armed him with the knowledge that complaints to Midwestern would be referred to him first rather than to the State Commission.

[7,8] The active assistance of Midwestern was not the only cause of customer loss after December 1, 1964. If Midwestern had reported its knowlege of Dobich's fraud to the Indiana Securities Commission, the evidence showed that the Indiana Securities Commission would have put Dobich out of business. Notwithstanding scattered failures on the part of the Indiana Securities Commission to follow up earlier complaints concerning Dobich's slow delivery of securities, the district court could reasonably believe the testimony of Martin K. Edwards who was the State Securities Commissioner on December 1, 1964. He testified that if Midwestern had reported all of the information concerning Dobich's conduct in its possession in late November 1964, the Indiana Securities Commission would have suspended or revoked Dobich's license. Further support for the finding that the Indiana Commission would have acted if Midwestern had reported Dobich's misconduct is found in the presumption that public officials properly discharge their official duties. Harrell v. Sullivan, 220 Ind. 108, 116, 40 N.E.2d 115, 118, 41 N.E.2d 354, 140 A.L.R. 455 (1942).

### IV. *Midwestern had a duty to report Dobich's activities to the Indiana Securities Commission or the SEC*

The silence theory that underlies this case is that Midwestern, by failing to report Dobich's activities to the SEC or the Indiana Securities Commission, knowingly and purposefully encouraged an artificial build-up in the market for its stock so that it would be in a more favorable position to consummate the potential merger it was then negotiating. It is our view that the district court was correct in concluding that Midwestern's acquiescence through silence in the fraudulent conduct of Dobich combined with its affirmative acts was a form of aiding and abetting cognizable under Section 10(b) and Rule 10b–5. Here Midwestern's failure to report Dobich after December 1, 1964 was more than omission; it was a signal to Dobich that further inquiries would not be handled as earlier threatened, and that Dobich

would be given an opportunity to cover his non-deliveries. Without deciding whether the failure to report Dobich's activities to the Indiana Securities Commission would in itself give rise to liability under Rule 10b-5, we find that under all the facts and circumstances of this case, Midwestern's actions amounted to a tacit agreement with Dobich to prevent complaints from reaching the Commission, thus facilitating the fraud and allowing Dobich's scheme to continue to Midwestern's benefit. Violations of this rule should be "fashioned case by case as particular facts dictate." Kohler v. Kohler Co., 319 F.2d 634, 637–638, 7 A.L.R.3d 486 (7th Cir.1963). The district judge was correct in saying:

> A basic philosophy of the Securities Exchange Act of 1934 is disclosure and is directed toward the creation and maintenance of a post-issuance securities market that is free from fraudulent practices. The investor's protection is the paramount consideration of much of the federal securities legislation and, in particular, of the 1934 Act here involved. The effect on an investor of an issuer corporation's failure to disclose improper activities of a brokerage firm dealing heavily in the issuer's stock, where the broker's activities create an appreciable risk of loss to that investor, may be just as dangerous and equally as damaging as a failure by the issuer to disclose information of its own improper activities affecting the value of its stock. The loss to the investor may well be the same. 259 F.Supp. at 680.

V. *The issue of Midwestern's affirmative misconduct was properly before the district court*

Midwestern claims that it was deprived of the right to prepare for and defend against the charge of affirmative action constituting encouragement to Dobich and causing him to continue a course of action which he would not otherwise have pursued. Midwestern protests that "at no time prior to this appeal did either party brief or argue" the affirmative misconduct theory. Although the complaint only alleged silence and inaction, Midwestern's motion for a more definite statement said that the "aiding and abetting by defendant intended to be asserted [in the complaint] is its failure to report the conduct of [Dobich] but the allegation is not so limited." Also, the affirmative acts relied on were in furtherance of a plan of nondisclosure as discussed above, so that questions decided on one theory of wrongdoing necessarily have a bearing on the other.

An indication of the notice that Midwestern had of the scope of proof is contained in the plaintiff's objections to the defendant's pre-trial statement of issues: "the evidence may actually show a deliberate purpose on the part of the Defendant." At trial, defense counsel specifically inquired of witnesses whether they had engaged in action to aid and abet Dobich. Finally the trial judge's decision stated that: "When trial commenced, both sides were well aware of the evidence upon which each side has based its claims or defenses. If in any respect the pleadings do not strictly conform to the evidence, no prejudice to either side could have resulted therefrom." We agree.

The judgment of the district court is affirmed.

MORGAN, District Judge (dissenting).

If I could find any credible evidence to support it, I would concur in this decision. I do have the utmost and profound respect for the wisdom and general fairness of my judicial superiors on this panel, as well as for my senior brother who decided this case below; and I confess a very strong desire to vote for affirmance of a district judge, especially on an evaluation of evidence; and I do feel the natural sympathy for each of the several hundred persons who were defrauded so grossly by Mr. Dobich. However, I am simply unable to substitute these feelings for the mini-

mum evidence of fault I believe is and should be necessary to establish liability. I must respectfully dissent.

It seems to me that the trial judge's Memorandum of Decision itself (286 F. Supp. 702) shows that the decision rests on a compounding of wholly unjustified inferences and upon pure speculation, and that it results in creation of tort liability without any real suggestion of fault in the evidence. It also seems to me that the majority opinion here, while enunciating sound but inapplicable principles of law in scholarly fashion, fails to come to grips either with the real questions of proof involved or the unsound process of reasoning employed below. Judge Swygert states that conclusions must be arrived at by "logical deduction." I agree. I would most certainly not undertake to resolve testimonial conflicts on appeal, but I must disagree with the logic of the deductions which led to this judgment. It is respectfully observed that simply saying conclusions have been derived from much complex evidence neither makes that statement true nor makes those conclusions logical.

It is now abundantly clear (as correctly found and related by the trial judge) that, at the time of his death in July 1965, Mr. Michael Dobich[1] had failed to make delivery of many thousands of shares of Midwestern stock, for which some several hundred customers had paid him approximately $2,900,000; that he had pursued a consistent practice of making fraudulently short sales of this as well as other stocks to a great many people; that he had violated the securities laws and regulations of his state and nation most grossly; and that his corporation was actually deeply insolvent before there was any contact between him and the defendant. It seems equally clear to me that there is simply no evidence whatsoever in the record that the defendant, Midwestern, had any actual knowledge or even any faint suspicion of his financial condition or his operations, or that it was in any way involved with Dobich (or in any way connected to this fraudulent mess), except in a few very definite and specific ways which are undisputed in the record. The whole fabric of the decision rests on those involvements and connections, not on conflicts in testimony. One may refuse to believe all of defendant's witnesses and accept implicitly all of the competent testimony of plaintiff's witnesses and still there is simply nothing to suggest more than a highly speculative possibility that defendant could have any knowledge of any fraud, much less that it engaged in any intentional aiding or abetting thereof.

Furthermore, the trial judge did a thorough job of canvassing an immense trial record for the true facts disclosed thereby and a conscientious job of relating all of the evidence that was in any way significant in his memorandum. I have found nothing of significance, which could conceivably lend support to the decision, which the trial judge did not relate. It does not seem to me that the majority opinion here states anything additional.

Boiled down, the analysis of the evidence and the process of reasoning employed by the trial judge is, that since Midwestern's top management knew from the Dellwo incident in June, 1964, and the subsequent events from August to December 1, 1964, that Dobich had once permitted what the Indiana Securities Commissioner called "rumors" and "unreasonable spreads," that Dobich was concentrating a sales effort on Midwestern stock, that he had been late in deliv-

---

1. It seems unnecessary to distinguish for any purpose here between Mr. Dobich and Dobich Securities Corporation, through which his fraudulent depredations may all nominally have been carried out. He controlled the operation completely and was apparently a skilled "con-fidence man" of the first magnitude. He "conned" his own salesmen. The trial judge is impressed that a Midwestern officer began a letter to him "Dear Mike," after a single meeting, but does not notice that the Indiana Securities Commission also addressed him this way on occasion.

ering stock to some ten customers (all of which was eventually delivered), and that he had concocted false reasons for his lateness, they "knew well before November 30, 1964 that Dobich was dealing in a fraudulent manner with his customers' money." The majority opinion here goes further to find that this all shows it reasonable to conclude that Midwestern management knew "he was selling Midwestern stock which he did not own and did not then have funds to purchase." These conclusions seem to me to be monumental *non sequitur* in relation to the stated premises. There is simply nothing here to suggest damaging fraud, much less anything whatsover about Dobich's financial condition. Such knowledge of fraud on the part of the Indiana Securities Commissioner is not inferred, yet the record shows clearly and beyond dispute that the Commissioner had received numerous complaints of late delivery of various stocks by Dobich, going back to 1962, which he accumulated in one Dobich file but considered completely resolved in each instance by subsequent delivery.

It is certainly recognized that any single day any broker has his customers' money, before he buys the stock for which the money was paid, he may be, and presumably is, using that money as working capital. Any abnormal delivery delay suggests a "short sale" to any knowledgeable person. This simply does not suggest fraud, however, or make a short sale fraudulent. There simply is no harm of any kind to the purchaser who ultimately receives his stock, unless there is no accounting for intervening dividends or he is unable to sell the stock when he wants to because he doesn't yet have it. There is no suggestion of either circumstance here. Presumably that's why "lateness," which was crowned by eventual delivery, didn't excite the Indiana Securities Commissioner, whose office exists to police such things.

An inference of any knowledge of actual Dobich fraud by Midwestern on the evidence here, therefore, seems totally unwarranted and very unjust. It is noted particularly, however, that the trial judge doesn't suggest ground even for any suspicion, either by Midwestern or the Indiana Securities Commissioner, that Dobich was vastly short and unable to deliver at any point, because he actually was observed to deliver regularly, in substantial volume long after November 30, 1964, on complaints received either by the Commission or Midwestern and referred to Dobich with a demand for delivery. There were 22 such to the Commission after December 1, 1964, leading to transfers up to two days before Dobich's death in July, 1965.

The stipulated fact that Dobich was responsible for actual transfer on the books of Midwestern of 22,319 shares for 362 people between May and December, 1964, hardly makes "lateness" in ten cases look like he couldn't deliver, especially when he did quickly deliver on complaint. This suggests only that he could do so. Long and detailed judicial recitations of Dobich's "lulling" tactics to many other customers not known to Midwestern, and of the depth of his actual insolvency known only to himself at that time, contribute nothing to showing guilty knowledge of this defendant.

From this wrongly inferred and thus false premise of known Dobich fraud on or before November 30, 1964, however, and the obvious fact that Midwestern's officers rather naturally liked to see a high market for its stock, the trial judge reasons that Midwestern's officers' failure to notify the Indiana Securities Commissioner of complaints of late deliveries by Dobich, coupled with their notification to Dobich of such with a simple demand for delivery, on penalty of report for failure, substantially encouraged Dobich and thus amounted to aiding and abetting his fraud, because if they had told the Securities Commissioner what they knew, we are told he would have put Dobich out of business in December, 1964. The majority here finds in this picture, without relating

evidence of it, a "plan" on the part of Midwestern "to aid and abet Dobich in his fraudulent activity."

These conclusions seem to me to rest on nothing but pure judicial speculation and conjecture and to be directly contrary to the only logical inferences which are possible from the evidence. Nothing in the letter to Dobich of November 30, 1964, concerning the Dillon complaint, or the letter of December 1, or subsequent practice, in any way retracted previous threats of exposure to the Indiana Securities Commission or indicated the slightest toleration of late delivery of Midwestern shares. I simply am unable to comprehend how they could have, as my esteemed brothers in the judiciary have said they did, in any way amount to a "signal" or indicate to Dobich in any manner either that he was thenceforth free of the previous threat or what Midwestern would do or would not do on any future complaint. On the contrary, the opposite inference seems unavoidable from the evidence, that this practice simply saved one step in correspondence because it did obtain delivery of the shares involved, which, as clearly shown by the Indiana Securities Commissioner's own testimony and his file record, was the maximum extent of his interest in late delivery complaints. His statement that had he been advised of the nine complaints of late, but eventual, delivery which came to Midwestern over the period of four months prior to December 1, 1964, he *would have* instituted an audit and revoked the Dobich license, seems to me nothing short of ridiculous in view of the facts that he had never done that in any case in his four-year tenure, that he had "by far" more work than he could handle generally, that this action would have required a special administrative appropriation for auditors, and that he didn't do it at any time thereafter, in spite of the twenty-two complaints he did receive about Dobich thereafter. Not only is this self-serving assertion not testimony of a fact within the knowledge of the witness, but it seems much more like a whimsical wish

of what might have been had he followed the clues it is now said Midwestern should have followed. Fraud such as this naturally seeks a scapegoat, and one with an apparently deep pocket is naturally most desirable. His "would have" action is wholly belied by his prior and subsequent practice, and this "testimony" seems to me so tainted by hindsight and so speculative as to be completely beyond serious judicial reliance as evidence. Yet the trial judge and the majority here treat this assertion as the certainty which supports the whole theory of causal connection and thus of "aiding and abetting" on which liability is founded.

It is respectfully suggested that the reasonable presumption that public officials discharge their official duties hardly survives undisputed evidence that the official involved has not done on twenty-two later complaints the very act sought to be presumed that he would have done if he had known of nine earlier complaints.

Some suggestion is made that notice from Midwestern to the Commissioner of late delivery by Dobich would have had, and could reasonably have had, greater weight than such notice from other sources, such as the investors themselves. Any logic or justice in that idea escapes me completely. It seems clear that the total failure by anyone to discover the facts behind the complaints was the important thing lacking here, and not who might have made complaints to the Commissioner. It is apparent that the Commissioner knew more than Midwestern, about more cases of lateness and over a longer period. He had a public duty to perform. Midwestern management had an insurance company to run as well as supposed shareholders to keep happy. That was their primary duty. The plaintiff here and others in her class could also have complained to the Commissioner. The sad fact is that most of them didn't, and the Commissioner *didn't do* what he could have done even though he had far more reason to have a suspicion of fraud than

Midwestern is now told amounts to *knowledge* of fraud and *aiding and abetting* on its part. The fact that the Commissioner didn't suspect what Dobich was actually doing, as *nobody* did, and hence didn't take the action *he alone could take*, is a tragedy precipitated by a very busy and clever confidence man; but I am wholly unable to pretend that his whimsical wish and his finger pointing can somehow justify judges in finding one person (Midwestern), who simply didn't tell him all they knew, liable to several hundred others who didn't either. The folks in plaintiff's class didn't notify Midwestern!

Midwestern's action on a late delivery complaint always consisted of taking prompt action to see that Dobich did make delivery to persons it was informed had bought its stock from him. Its failure to suspect fraud is far less culpable than the same failure on the part of the Indiana Securities Commissioner because it had less to go on. Its action in obtaining delivery simply did not help Dobich in any way to "lull" others or to avoid complaints to the Commissioner by others.

The trial court says that, because Dobich's explanations of slow delivery were not truthful, as intelligent and responsible businessmen, Midwestern management "must have realized that there were others who had purchased shares from Dobich *without* getting delivery." That seems patent *non-sequitur* on its face; and it is beyond my comprehension how Dobich's actual delivery after complaint, and sometimes before or co-incidental with complaint, can possibly be thought to suggest anything but slow delivery which did regularly become actual delivery. It just doesn't suggest non-delivery or inability to deliver. It suggests the opposite. It must not be overlooked, as noted above, that Dobich, in this period from May through December, 1964, made 362 transfers of Midwestern stock involving 22,319 shares. From January through July, 1965, he made 899 transfers involving 48,409

shares. How fast or slow they were was not known to Midwestern, except for the few who complained of slow delivery and then received their shares. This simply does not suggest in the slightest way, however, that some unknown other people weren't getting the shares they had bought from him. The knowledge that everyone now has, that many people were not, is simply not chargeable injustice to anyone but Dobich in November, 1964.

There is nothing but the trial judge's pure conjecture (and the Indiana Securities Commissioner's incredible self-serving "would have" statement at the trial several years later) to indicate that Midwestern's program for obtaining delivery from Dobich "was much less likely to result in curtailment of Dobich's activities than a report to the Commission would have been." According to all available evidence at the time, and all credible evidence at the trial, the programs of the Indiana Securities Commissioner and Midwestern, on receipt of a complaint for late delivery of shares by Dobich, were identical, *i.e.*, write Dobich and demand delivery on threat of legal action and chalk that problem down as successfully solved when delivery was made thereafter. How any inference can possibly be drawn that earlier curtailment of Dobich's activities even might have been achieved by report of a few more late deliveries to the Commissioner seems absolutely preposterous to me.

Without evidence of knowledge of Dobich's fraud by Midwestern *and* some action or inaction by Midwestern which really did aid or abet that fraud, liability is unsoundly held. There must be some credible evidence of *both*. Here there seems to me no evidence or logical inference of either. Even if both inferences, which seem the antithesis of logic, however, are accepted, the decision runs afoul of the principle that justice does not permit compounding of inferences. See United States v. Ross, 92 U.S. 281, 283–284, 23 L.Ed. 707. The decision

here seems to pile illogical inferences to a depth of confusion and thus seems to me wholly unsound.

It is suggested by the trial judge and the majority here that Midwestern gained, or *may have sought to gain,* a benefit by protecting Dobich, in that putting him out of business while he was dealing heavily in its stock would have caused a decline in its market value and been embarrassing in merger negotiations. While possibly true, that simply suggests a possible motive and contributes nothing by way of evidence to indicate knowledge of fraud or aiding and abetting its perpetration. The compounding of invalid inferences as to knowledge and help is not supported in the slightest by further speculation as to motive. This also overlooks completely that Dobich could not prop up the price of Midwestern shares by any shares he was selling *until he did buy* to cover his sales. If Midwestern had had any idea that he was not buying any substantial number of shares for which he was absorbing market demand by sales, they could not have thought, and I don't see how judges can think, he was supporting the market price. The opposite would be true. If his visible activities were notice that he was holding up the market price, they just can't also be notice of his fraud.

I find it completely impossible to infer in the slightest degree from any evidence in the record here that Midwestern's effective action to get delivery of its stock to purchasers thereof who complained to it amounted "to a tacit agreement with Dobich to prevent complaints from reaching the Commission, thus facilitating the fraud and allowing Dobich's scheme to continue to Midwestern's benefit," as stated in the majority opinion. Such a conclusion seems to me not to follow logically from any stated premise, and from my understanding of the record, it seems based upon absolutely nothing but judicial suspicion, conjecture and speculation. Such a conclusion, unsupported by any reasonable inference from evidence, gains no validity by repetition.

While a trial judge's findings of fact, if there is substantial evidence to support them, are entitled to great weight, reversal should take place where the trial court misapprehended the effect of undisputed evidence. Hart v. Gallis, 275 F.2d 297, 299 (7th 1960). See also Wigginton v. Order of United Commercial Travelers, 126 F.2d 659, 661 (7th 1942), cert. den., 317 U.S. 636, 63 S.Ct. 28, 87 L.Ed. 513, and Pflugradt v. United States, 310 F.2d 412, 415 (7th 1962).

Justice does simply not permit blame to be based solely on conjecture in the guise of inference. Moore v. Chesapeake & Ohio Ry Co., 340 U.S. 573, 578, 71 S. Ct. 428, 95 L.Ed. 547 (1951); Iwaniuk v. Bethlehem Steel Corp., 402 F.2d 309, 311 (7th 1968); Euson v. Starrett, 277 F.2d 73, 75–76 (7th 1960). Disbelief of defensive testimony simply doesn't supply affirmative evidence of fault or wrongdoing which is needed to support a judgment of liability. Moore v. Chesapeake & Ohio Ry. Co., 340 U.S. 573, 576, 71 S.Ct. 428, 95 L.Ed. 547; Bankers Life & Cas. Co. v. Guarantee Reserve, 365 F. 2d 28, 33–34 (7th 1966), cert. den., 386 U.S. 913, 87 S.Ct. 862, 17 L.Ed.2d 785 (1967).

The undisputed evidence shows clearly that what Midwestern is accused of doing affirmatively here is exactly what the Indiana Securities Commissioner always did on complaints of late delivery. That is simply not evidence of knowledge of or complicity in Dobich's fraud on the part of either. The only failing of which Midwestern is accused is failing to report each complaint of late delivery to the Commissioner. That it admittedly didn't do. Neither did the plaintiff. Instead, Midwestern did what the Commissioner almost certainly would have done. The only legal duty to make such a report on which we are told is a completely fictitious one supposedly created by Midwestern's own threat to do so and supposed knowledge of the fraud, which the evidence clearly shows no one

really had. I can find no evidence of any knowledge or suspicion on the part of Midwestern of Dobich's fraud prior to his death, or any basis for inference thereof. I can find no evidence or basis for inference that Midwestern contributed anything to it, intentionally or otherwise.

While I agree that the issue of any affirmative misconduct by Midwestern was properly before the trial court, for the reasons stated in the majority opinion, I cannot agree that any such was proved or even reliably suggested, or that any case whatsoever for liability has been made against Midwestern here. For the reasons stated herein, I would reverse the judgment and dismiss the complaint with prejudice.