Maurie M. GREEN, Plaintiff,

v.

JONHOP, INC., an Oregon corporation et al., Defendants.

Civ. No. 71–463.

United States District Court,
D. Oregon.

March 16, 1973.

Phil Cass, Jr., Riddlesbarger, Pederson, Young & Horn, Eugene, Or., for plaintiff.

Garry P. McMurry, McMurry & Nichols, Portland, Or., for defendant.

## OPINION

SKOPIL, District Judge:

Plaintiff, Maurie M. Green, brings this action against two corporations, a defunct corporation, an officer of one of the going corporations, and a securities salesman, for alleged violations of Section 10(b) and Rule 10b–5 of the Securities Exchange Act of 1934. 15 U.S.C. § 78j; 17 C.F.R. § 240.10b–5. He also alleges violation of the Oregon Blue Sky Law. O.R.S. § 59.115. Jurisdiction is based on Section 27 of the Securities Exchange Act of 1934. 15 U.S.C. § 78aa. The case was tried before the Court.

### FINDINGS OF FACT

1) Jonhop, Inc. (hereafter "Jonhop"), a small Oregon manufacturer of wind-

shield cleaning fluid, made a public offering of stock in August, 1968, and was traded thereafter on the over-the-counter market.

2) American Western Securities, Inc. (hereafter "American Western") was the underwriter for Jonhop and was making a market in Jonhop shares during the period relevant to this case. American Western is now dissolved.

3) Alcorn & Black, Inc. is a broker-dealer who employed C. Michael Trotter from July, 1969, to July, 1971.

4) Robert K. Jones is a Director, Executive Vice President and principal shareholder of Jonhop.

5) C. Michael Trotter is now a stockbroker who was a securities salesman at all relevant times herein.

6) In January, 1969, plaintiff spoke on the phone about Jonhop with defendant Trotter, then a securities salesman for American Western. Plaintiff then met Trotter in Portland in February, 1969, to discuss Jonhop as an investment. They went together to talk with defendant Robert K. Jones. Both Trotter and Jones felt that Jonhop had experienced a reversal from previous losses and would have earnings for the current fiscal year ending March 31, 1969. Plaintiff later spoke, at Jones' suggestion, with James Robb, professor of marketing at Portland State University. Robb was optimistic about the future of Jonhop. Green was not told that Robb was a Jonhop Director.

7) Trotter gave plaintiff an American Western "Market Comment" on Jonhop. The comment gave the net sales for Jonhop from 1966 through 1968, and estimated the 1969 figure would be $1,000,000, up from $404,518 in 1968. The optimistic text of the comment related information on the company's operations and future plans. It made no mention of previous substantial losses. The comment ended with a recommendation to buy Jonhop for capital gains. Jones

first saw the comment in American Western's office in September, 1968. Although he had no basis upon which to conclude the estimate was accurate, he said nothing to American Western.

8) Plaintiff purchased 2,000 shares of Jonhop stock from American Western, as principal, on February 25, 1969, for $17,500.

9) Plaintiff entered the United States Army but kept in touch with Trotter. In January, 1970, while enroute to Korea, plaintiff read the 1968–69 Jonhop Annual Report which had been sent to his mother's home in Eugene, Oregon, in June 1969. The report emphasized the turnabout in the earnings. Highlights on page 2 pointed out a 134.8% jump in net income, a 117.8% increase in net income per share, and a 122.5% increase in return on sales. The text of the report talked of record sales and profits and the "significant cost reduction" in operating expenses. There was a 55.2% gain in sales over the previous year's record and a corresponding increase of only 12.8% in operating expenses. (Page 3.) The report stressed the "complete reversal of Jonhop's first four years" with several charts and graphs.

The comparative statements of income and loss pointed out the sales increase from $346,355 in 1968,[1] to $537,483 in 1969, the small increase in selling expenses, net income of $21,981 (up from a loss of $63,075), and earnings per share of $.08 (up from a $.45 loss per share). Both net income and earnings had no such reference.

The comparative balance sheets showed the last asset entry as:

| | March 31 1969 | Unaudited March 31 1968 |
|---|---|---|
| DEFERRED CHARGES | | |
| Market development costs—less amortization (Note C) | $123,308 | |
| Excess acquisition costs—less amortization (Note D) | 87,310 | |
| | $210,618 | |

1. The "Market Comment" did not give an accurate figure for 1968 sales. P. 3, *supra.*

Note C [2] refers to a change in accounting policy, adopted in September, 1968, which is intended to account for market development costs. These are non-recurring costs which are incurred in developing a new market. While such costs were previously shown as part of the selling expenses, they are now to be capitalized and amortized over three years. The practical effect of the change is that selling expenses for 1968–69 were reduced by $123,308, and the net income increased by the same amount. If the costs had been shown as selling expenses, the net income would have been reduced to a net loss of $101,327.

Also stressed in the report was the development of the special "fleet formula" by Jones. Termed "An American Business Success Story," the report mentioned it often and featured a separate article on the last page, complete with pictures of Greyhound buses. It was stated that a Greyhound maintenance memorandum instructed its garages to stock Jonhop's formula in 55-gallon drums and that those garages serviced 6,000 coaches.[3]

10) Prior to leaving for Korea, plaintiff discussed with Trotter the possible purchase of additional shares of Jonhop for the purpose of averaging the cost of all shares.

11) Between January and April, 1970, Trotter corresponded with plaintiff in Korea. In his earlier letters, Trotter thought it a good idea to buy more Jonhop stock at the lower price. Trotter's later letters were much less enthusiastic about Jonhop. He said he had "doubts" and that he was worried about Jonhop's earnings for the current fiscal year. About March 23, 1970, plaintiff gave Trotter a buy order for 1,000 Jonhop shares at 4⅛ net.

12) Trotter sent plaintiff an American Western "Special Situation Report" along with one of his letters in early March, 1970. That report contained

2. "NOTE C—DEFERRED MARKET DEVELOPMENT COSTS

"During the current fiscal year, the Company established a new policy to account for market development costs. This policy is to capitalize all related expenses which are incurred in developing a new market area or product line. The balance under this caption, net of amortization, represents expenses incurred during the current fiscal year. These expenses are amortized on a monthly basis over the balance of the market development period which is three years. If this policy were to be retroactively applied to like expenditures in prior periods, there would be no significant effect on the 1968 or 1969 operating results. Expenses of this nature would have been amortized prior to the current fiscal year. However, this change in policy accounting for 1969 market development costs had the effect of decreasing selling expenses $123,308 ($.45 a share) with a corresponding change from a net loss to a net income for the year.

"To the extent that the Company is able to enter into these new market areas or product lines, it is anticipated that there will be increased sales; however, there can be no assurance that the new areas will be profitable or that it will acquire a significant percentage of the market. The new market areas involved are the States of California and North Carolina plus amounts expended in the market development of the Company's new fleet formula.

"For income tax purposes, these costs will be expensed as period costs and no deferred tax liability results due to the operating loss carry-forward from prior years." Annual Report at 13.

See also the last paragraph of the Accountants' Report:

"In our opinion, subject to the recovery of $123,308 of deferred market development costs referred to in Note C, the accompanying balance sheet and statement of stockholders' equity present fairly the financial position of Jonhop, Inc., at March 31, 1969, and the changes in stockholders' equity other than the section therein relating to retained earnings for the year then ended, in conformity with generally accepted accounting principles applied on a basis consistent with that of the preceding year except for the change (in which we concur) in the accounting for market development costs referred to in Note C." Annual Report at 9.

3. It later turned out that labor costs of installation prevented the use of the formula and very few sales were ever made.

much of the information which had been in the 1968–69 Annual Report, including the $.08 earnings per share for 1968–69. It also predicted a net income per share of $.40 to $.50 for 1969–70, and recommended purchase of Jonhop. Defendant Jones had received that report in the mail in 1969, shortly after its publication, and was aware that it was being sent to Jonhop shareholders. Jones testified that he and Jonhop President Hopper discussed the projection and concluded their figures did not match that projection. Therefore, Jones said that Hopper called Stan Parsons at American Western and objected to the specific projection.

In one of his letters to plaintiff, Trotter quoted Jones as predicting $.40 to $.50 per share earnings. That same prediction was circulating around the brokerage trade in Portland. Jones attended sales meetings at American Western where Jonhop and the Special Situation Report were discussed, but he said nothing about the earnings projection. In another private conversation with Trotter, Jones predicted that earnings for 1969–70 would exceed those of 1968–69. Jonhop issued no written statement nor made any public announcement contradicting the projection.

13) Jonhop had no earnings in the 1969–70 fiscal year but suffered a net loss of $172,271, or $.48 per share.

14) Plaintiff purchased 1,000 shares of Jonhop on April 8, 1970, for $4,125. American Western owned the block of shares sold by Trotter.

15) Plaintiff sold 2,900 shares of Jonhop on June 15, 16, 17 and 18, 1971, for $5,629.50.

16) Plaintiff filed suit on July 1, 1971.

## I
## THE EARNINGS PREDICTION MADE BY JONES

■ With respect to the predictions made by defendant Jones to plaintiff in February, 1969, that Jonhop would have "earnings" for the current fiscal year, I find no violation of the securities laws. Businessmen are always optimistic about the future, and such a statement does not rise to the level of a material misrepresentation, especially since the statement was true. Jonhop did have earnings for the 1968–69 fiscal year.

■ Moreover, in such a conversation about the general future expectations for the company, Jones was not required to qualify general statements about future performance by relating a change in accounting method which occurred five months previously. Jones did not know at that time if that change would even affect earnings. Under these circumstances, such an omission would not be material in the sense that a reasonable investor would have considered it important in making his investment decision. Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); List v. Fashion Park, Inc., 340 F.2d 457 (2nd Cir. 1965).

## II
## THE AMERICAN WESTERN "MARKET COMMENT"

■ I find that the prediction in the American Western "Market Comment" of 1969 sales of $1,000,000 to be a misrepresentation of a material fact within the meaning of Rule 10b–5.[4] I also find that the failure to mention Jonhop's previous losses was a misleading omission.[5] Furthermore, plaintiff relied on this comment in making his purchase in February, 1969, of 2,000 shares of Jonhop. It is true that not every inaccurate prediction is actionable under the securities laws. S.E.C. v. R. A. Holman & Co., 366 F.2d 456, 457–458 (2nd Cir. 1966), aff'd on rehearing, 377 F.2d 665 (2nd Cir. 1967). However, grossly inaccurate statements such as this are not just "mildly misleading."

---

4. The comment also misstated 1968 sales. N. 1, *supra*.

5. This omission is not actionable for Green since he was aware of the losses from his conversation with Jones.

■ The $1,000,000 estimate was nearly three times the previous year's figure and considerably larger than the actual 1969 figure of $537,483. American Western had no basis for making such an estimate and made no investigation of its accuracy. Here American Western was the underwriter for, and had a substantial position in, Jonhop stock. In the course of selling the stock, they may make recommendations to their customers. However, it is a violation of the anti-fraud provisions of the 1934 Act to recommend a security without an adequate and reasonable basis. Midland Securities, Inc., 40 S.E.C. 635 (1961).

Jones admitted that he had no figures that would support the American Western 1969 sales estimate. Nevertheless, he did nothing to inform any officers of American Western of the inaccuracy of the prediction or point out the misleading nature of the entire "Market Comment" after he received it in September, 1968. Therefore, the comment had already circulated in the investment trade for at least six months by the time that Green received it from Trotter. No Jonhop official ever questioned American Western or took any action at all with respect to that comment.

■ Jones' and Jonhop's silence and inaction encouraged reliance by the public on the misrepresentations and omissions in the comment, since it was well known that American Western was the underwriter and principal dealer in Jonhop stock. Such acquiescence through silence is a form of aiding and abetting cognizable under § 10(b) and Rule 10b–5. Brennan v. Midwestern United Life Ins. Co., 417 F.2d 147 (7th Cir. 1969), cert. denied, 397 U.S. 989, 90 S.Ct. 1122, 25 L.Ed.2d 397 (1970).

### III

### THE JONHOP 1968–69 ANNUAL REPORT

■ Read as a whole, Jonhop's 1968–69 Annual Report portrays a misleading picture of the company's financial condition. The entire report stressed the "reversal," the small increase in selling expenses, the first "recording of a net profit," and hinted at potential sales to Greyhound. It conveys the impression of a company that has overcome its past problems and is on the move upward. It is true that Note C to the Accountants' Report indicates that selling expenses were reduced by $123,308 ($.45 per share) and that resulted in a net profit instead of a loss. However, the failure to refer to Note C after selling expenses and the tone of the rest of the report effectively lulled readers into disregarding the full import of Note C. False and misleading statements in annual reports may be actionable under § 10(b) and Rule 10b–5. S.E.C. v. First Standard Corp., CCH Fed. Sec. Law Rpts. ¶ 91,824 [1966–67 Transfer Binder] S.D.N.Y., Oct. 10, 1966). However, since the explanation was in the report for the careful reader, I am reluctant to find that the Annual Report, by itself, constituted a violation of the securities laws.

### IV

### THE AMERICAN WESTERN "SPECIAL SITUATION REPORT"

Although I have refused to find the Annual Report, by itself, violative of Rule 10b–5, when viewed in conjunction with the American Western "Special Situation Report," it had an important impact upon potential investors.

■ As with the $1,000,000 sales estimate, American Western had no basis for the earnings projection for 1969–70 of $.40 to $.50 per share. If they had made an investigation, they would have discovered that such a figure had no support at Jonhop. The actual year-end figure was a $.48 per share loss, a 200% overstatement. The report made no mention of the accounting change that resulted in the 1968–69 net income per share figure. This report also recommended purchase of Jonhop stock. I find the overstatement of earnings to be an untrue statement of material fact in connection with the purchase of a secur-

ity which violates Rule 10b–5 and § 10(b).

 This time Jonhop decided to take some action. President Hopper talked with an officer of American Western and protested the inaccurate projection. However, although the report was published sometime in the summer of 1969, it was still circulating in the trade in March, 1970, when Trotter, then working for Alcorn & Black, Inc., sent it to Green. Moreover, other actions by Jones are inconsistent with the protest to American Western. He attended sales meetings at American Western at which Jonhop and the Special Situation Report were discussed. He never denied the accuracy of the earnings prediction at any of those meetings. He was heard to predict earnings larger than 1968–69 in casual conversation, although he had no basis for making such a conclusion. Trotter confirmed the earnings prediction. with Jones on the phone and relayed the confirmation to the plaintiff in a letter.

Therefore, I conclude that, although Jonhop officials may have made a token complaint to American Western about the earnings prediction, they permitted the report to continue in circulation and also took affirmative action to encourage its acceptance. Such a course of conduct violates Rule 10b–5. Brennan v. Midwestern United Life Ins. Co., *supra*.

## V

### THE REQUIREMENT OF PRIVITY AND CAUSAL CONNECTION

 It is unnecessary that there be privity between Green and Jonhop or Jones. I find a sufficient connection between the misconduct of these defendants and the purchase of the securities by Green. Green is entitled to recover even if he bought no stock from these defendants themselves. Gann v. Bernzomatic Corp., 262 F.Supp. 301 (S.D.N.Y.1966). The requirement of privity is not enforced in securities cases, and one court has held it not to be required

at all with respect to actions brought under § 12(2) of the 1933 Act and § 10(b) and Rule 10b–5 of the 1934 Act. Freed v. Szabo Food Service, Inc., CCH Fed. Sec. Law Rpts. ¶ 91,317 [1961–64 Transfer Binder] (N.D.Ill, Jan. 14, 1964).

Except for Jonhop's misconduct in failing to take action with respect to American Western's fraudulent conduct and in encouraging acceptance of the inaccurate sales and earnings predictions, I find that American Western would have ceased its circulation of the false reports.

## VI

### JONHOP'S DUTY TO TAKE ACTION

 A corporation cannot be held responsible for all omissions or misrepresentations made about its financial condition and future prospects by every broker-dealer or securities salesman. It is only obligated to take some action when it learns of such misstatements or omissions and is aware that their publication or nonpublication will be misleading to members of the investing public. Under the circumstances of this case, failure by Jonhop or Jones to take appropriate action amounted to a tacit agreement with American Western to encourage investors to buy and hold Jonhop stock.

Jonhop officials should have notified American Western of the inaccuracies and given them an opportunity to cease any fraudulent conduct before taking action. Upon American Western's failure to cease, I suggest then an appropriate action would have been to report the conduct to the Oregon State Corporation Commissioner who has authority to enforce the Oregon Blue Sky Law, or to the Securities Exchange Commission. Brennan v. Midwestern United Life Ins. Co., *supra*, 417 F.2d at 155. Another alternative would have been to issue a public statement correcting or disaffirming the inaccurate information.

## VII

## LIABILITY OF TROTTER AND ALCORN & BLACK, INC.

 With respect to defendant Alcorn & Black, Inc., I find no evidence to support any liability based upon the federal or state securities laws.

 I find that defendant Trotter has not individually violated any of the securities laws. All of his information came from the broker-dealers who employed him or from Jonhop officials. In making recommendations, Trotter used reports issued by American Western and occasionally confirmed that information with Jonhop officials. American Western, as the underwriter and market-maker in Jonhop, should have been a reliable source of information, and the use of their reports is some evidence of reasonable care on Trotter's part. The mere circulation of such reports does not constitute a violation of Section 10 of the 1934 Act, Rule 10b–5, or O.R.S. § 59.115. *See* In the Matter of Edgerton, Wykoff & Co., CCH Fed.Sec.Law Rpts. ¶ 76,374 [1952–54 Transfer Binder].

## VIII

## THE OREGON BLUE SKY LAW

Plaintiff also claims that the conduct of defendants constitutes a violation of the Oregon Securities Law, O.R.S. § 59.-005 to § 59.445 and § 59.991, and specifically O.R.S. § 59.115,[6] the civil liability section.

 On the basis of the findings and conclusions made with respect to the federal securities laws, I find also that defendant American Western has violated O.R.S. § 59.115(1)·(b) and has failed to sustain the burden of proof of its lack of knowledge. I further find that defendants Robert K. Jones and Jonhop, Inc. have violated O.R.S. § 59.-115(3) in materially aiding the sale, by American Western, of Jonhop stock to the plaintiff Green. It is not necessary for purposes of O.R.S. § 59.115(3) for Jones or Jonhop to have communicated directly with Green in order to materially aid in the sale. Black v. Nova-Tech, Inc., 333 F.Supp. 468 (D.Or.1971).

As under the federal law, I find no liability under the Oregon Blue Sky Law for any acts of defendants Trotter and Alcorn & Black, Inc.

Under O.R.S. § 59.115(2)(a) and (b), Green is entitled to recover, in addition to costs and attorney's fees, the consideration paid for the securities, plus interest, if he tenders the stock. If he no longer has the stock, he can recover damages that would be recoverable upon a tender less amounts received, and interest on those amounts.

Accordingly, I find for the plaintiff against defendants American Western Securities, Inc., Robert K. Jones, and

---

6. O.R.S. § 59.115. Liability of person offering or selling securities unlawfully; limitations on proceeding.

(1) Any person who:

\* \* \* \* \* \*

(b) Offers or sells a security by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading (the buyer not knowing of the untruth or omission), and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission, is liable as provided in subsection (2) of this section to the person buying the security from him.

\* \* \* \* \* \*

(3) Every person who directly or indirectly controls a seller liable under subsection (1) of this section, every partner, officer, or director of such seller, every person occupying a similar status or performing similar functions, and every person who participates or materially aids in the sale is also liable jointly and severally with and to the same extent as the seller, unless the non-seller sustains the burden of proof that he did not know, and, in the exercise of reasonable care, could not have known of the existence of the facts on which the liability is based. Any person held liable under this section shall be entitled to contribution from those jointly and severally liable with him.

Jonhop, Inc., jointly and severally, in the following amounts:

1) $13,620.00, plus 6% interest per annum from February 25, 1969, for the purchase of the first 2,000 shares;

2) $2,375.50, plus 6% interest per annum from April 8, 1970, for the second purchase of 1,000 shares; and

3) $4,000.00 for attorney's fees and costs.

In addition, plaintiff must tender to American Western Securities, Inc., as seller, the 100 shares of Jonhop, Inc. stock which he still possesses.

This opinion shall constitute findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).