**Arnold B. ELKIND, Plaintiff,**

v.

**LIGGETT & MYERS, INC., Defendant.**

**No. 73 Civ. 2837.**

United States District Court,
S. D. New York.

Nov. 17, 1978.

See also D.C., 66 F.R.D. 36, D.C., 77 F.R.D. 708.

Kaplan, Kilsheimer & Foley by Robert N. Kaplan, Dale A. Schreiber, James B. Kilsheimer, III, Richard J. Kilsheimer, New York City, for plaintiff.

Webster & Sheffield by Donald J. Cohn, Paul A. Gangsei, Alan Gabbay, New York City, for defendant Liggett & Myers, Inc.

*Findings of Fact and Conclusions of Law*

MOTLEY, District Judge.

Plaintiff Arnold Elkind purchased 100 shares of Liggett & Myers, Inc. (Liggett) common stock on July 12, 1972 at $63⅜ per share on the New York Stock Exchange. He sold these shares on December 27, 1972 at $38⅛. He brought this class action against Liggett alleging violations of Section 10(b) of the Securities Exchange Act of 1934 (Act) (15 U.S.C. § 78j) and Rule 10b–5 (17 C.F.R. § 10b–5). Elkind is a citizen of New Jersey and Liggett is a Delaware corporation with its principal place of business in North Carolina. Liggett is one of the largest manufacturers of cigarettes. However, its business is now diversified and includes pet foods (such as Alpo), liquor, cereal, rugs and other products. This court issued an opinion on December 14, 1977 certifying as a class all those who bought Liggett stock from June 19 to July 18, 1972. As stated in that opinion, plaintiff voluntarily dismissed his complaint against the individual defendants at trial.

During the relevant time, Ralph P. Moore was Vice President and Chief Financial Officer and Daniel Provost was Director of Corporate Communications and Assistant Director of Corporate Marketing. In conjunction with its expanded business interests, Liggett employed a public relations firm, Edward Gottlieb & Associates, to help Liggett communicate with securities analysts.

In 1971 Liggett's diversified interests produced a record year. However, in 1972 Liggett's earnings dropped dramatically. In July 1972 Liggett issued a press release stating that its preliminary earnings figures for the second quarter showed a decline from the year before. The dispute in this case centers around events in June and July 1972 leading up to the issuance of the press release. The court makes the following findings of fact and conclusions of law.

Plaintiff alleges that Liggett violated Rule 10b–5 by failing to disclose the lowered earnings in June and by tipping this information. Plaintiff also contends that Liggett breached its duty not to make misleading statements by 1) failing to correct the earnings projections of financial analysts which it knew to be far too high; 2) making statements which, in light of the analysts' projections, Liggett knew would be misinterpreted; and 3) failing to issue a press release in June when it had the preliminary earning figures for April and May rather than waiting until it had preliminary figures for all of the second quarter in July. Plaintiff contends that Liggett officials acted with *scienter* and that these acts caused him harm for which Liggett is liable. The court finds that plaintiff has failed to carry his burden of proving these claims by a fair preponderance of the credible evidence.

Plaintiff's second cause of action is for tipping. The court finds that plaintiff has carried his burden in this respect. He has proved that Liggett officials tipped material inside information to financial analysts. Plaintiff therefore is entitled to recover under this cause of action.

*Facts*

In 1971 Liggett had earnings per share of $4.22. This was a record high with net earnings up to 18% over restated 1970 earnings.

In January 1972 Liggett's Board of Directors established a budget for that year which projected earnings of $4.30 a share. During the first half of 1972 financial analysts issued very favorable reports on Liggett's prospects for 1972. Many analysts projected a 10% increase in earnings. Liggett's own internal budget projections showed only a 2% increase in earnings. Many analysts submitted their reports to Liggett for review. At meeting with financial analysts, Liggett generally represented that it would have what it termed a "good year".

In March Liggett issued a press release stating that the first two months of 1972 had been good months for the company. In April Liggett offered a $50 million debenture issue.

On May 3, 1972, Liggett announced its figures for the first quarter of 1971, that is January through March. For this quarter, net earnings, before extraordinary credits and charges, had increased by 17% over the first quarter of 1971. Net earnings per share, after the credits, were $1.00 as compared to $.81 for the first quarter of 1971.

On May 15, the Liggett board of directors received preliminary figures for April which showed a sharp drop in earnings per share. April 1972 earnings were $.03 per share compared to April 1971 earnings which were $.30. Liggett issued no statement at this time. Its stock was selling at 68¾.

On June 19, the board of directors received the preliminary figures for May which showed earnings per share of $.23, a significant revival from April's figure of $.03 a share, but a decline from the earnings per share in May 1971 which were $.27 a share. Earnings to that date were $1.26, below the earnings for the same period in 1971 of $1.38, but ahead of the budgeted earnings for 1972. At this time Liggett's stock sold for $64½.

By July 14, Liggett stock was selling at $60. During the time between June 21 and July 18, the New York Stock Exchange commenced a stock watch investigation of Liggett stock. On July 17, the board of directors received the preliminary figures for June, the final month of the second quarter. Earnings for June were $.20 a share. Earnings for the first six months of 1972 stood at $1.46, down from $1.82 for the same period in 1971. On that day, the board of directors decided to issue a press release stating the preliminary earning figures even though Liggett had never done so before. The final figures would not be available for another two weeks.

On July 18, at 2:15 p. m., Liggett issued its press release stating that earnings per share would be down from 1971. The press release explained this decline in terms of a decline in earnings of Liggett's international cigarette operations, a decline in J. & B. scotch sales during the second quarter as a result of heavy trade sales in the first quarter in anticipation of an April price increase, a decline in pet food earnings because of higher raw material prices, manufacturing start-up costs, higher costs and lower volume and losses in another subsidiary due to high recall and compliance expenses to meet F.T.C. flammability standards.

After the July 18 press release the price of Liggett stock continued to fall from approximately $52 a share until it bottomed out at approximately $40 a share on August 7. In August the price rose briefly and then declined again. Earnings for 1973 and 1974 remained depressed.

I. *Failure to Correct Analyst's Projections*

In the first half of 1972 financial analysts were projecting that Liggett's earnings would increase by ten per cent in 1972. At this time Liggett's internal budget projections showed that Liggett expected only a two per cent increase in earnings in 1972. It was the practice of many of these analysts to submit their reports to Liggett for review before publishing them. Liggett

corrected any factual errors in the reports but refused to comment in any way on the earnings projections. Liggett stated that its policy was not to comment on incorrect opinions or projections based on correct factual data.

■ Plaintiff's expert witness testified that it was the custom and practice in the industry to correct analysts' earnings projections that were incorrect by a significant margin. There can be no doubt that the analysts' projections for Liggett were widely off target. Plaintiff contends that Liggett was under a legal duty to correct these projections which came to its attention. However, the Second Circuit has ruled otherwise.

In *Electronic Specialty Co. v. Int'l Controls Corp.*, 409 F.2d 937 (2d Cir. 1969), the Second Circuit rejected the plaintiff's claim that the defendant corporation had a duty to correct erroneous factual statements appearing in a Wall Street Journal article about the defendant. It was clear that the defendant had knowledge of the article. Defendant was involved in a tender offer battle with the plaintiff which was being covered by the Wall Street Journal. The article overstated both the extent of the defendant's holdings in the plaintiff's company and the price which defendant was likely to offer for shares in plaintiff's company.

The Second Circuit stated, at 949,

"While a company may choose to correct a misstatement in the press not attributable to it, cf, *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 857–64, 866–69 (concurring opinion) (2 Cir. 1968), we find nothing in the securities legislation requiring it to do so."

In *Electronic Security, supra,* the Second Circuit was ruling on a claim under § 14 of the Act. The court finds the Second Circuit's reasoning in that case equally applicable to a claim under § 10(b). *Hutto v. Texas Income Properties Corp.*, 416 F.Supp. 478, 482 (S.D.Tex.1976); *Milberg v. Western Pacific Railroad Co.*, 51 F.R.D. 280, 282 (S.D.N.Y.1970) (no likelihood of success on similar 10b–5 claim); *Zucker v. Sable*, 426

F.Supp. 658, 662 (S.D.N.Y.1976) (" . . . defendants had no obligation under the securities law to correct the [press] error.") (dictum). This is not a case in which Liggett failed to correct false statements made by its underwriter, *Cf. Greenhop v. Jonhop, Inc.*, 358 F.Supp. 413, 420 (D.Ore.1973), or someone else closely allied with the corporation, *cf. Brennan v. United States Life Insurance Co.*, 417 F.2d 147 (7th Cir. 1969).

The Second Circuit's ruling in *Electronic Specialty, supra,* has been criticized by commentators who would place a greater duty on corporations to correct press errors. A. S. Jacobs, *What is a Misleading Statement or Omission under Rule 10b–5?* 42 Fordham L.Rev. 243, 259 (1973). However, this court finds itself bound by the Second Circuit ruling in *Electronic Specialty, supra.* Therefore, the Court finds that plaintiff has not stated a cause of action against Liggett for failure to correct speculation about its earnings.

## II. *Liggett's Statements as Misleading*

At trial plaintiff dismissed his claim of false representations and relied solely on his claim of nondisclosure. Plaintiff also stipulated at trial that Liggett officials never stated in so many words that earnings would increase in 1972. Trial Transcript (Tr.) 493. However, in his post-trial briefs plaintiff appears to be raising this issue again.

Plaintiff contends that Liggett's statements, while not affirmatively misleading, were misleading because Liggett knew that its audience of financial analysts had predicted a 10 per cent increase in earnings for 1972. Liggett officials made only general statements that 1972 would be a "good year". Plaintiff's expert witness testified that such a statement would mean to him that Liggett expected to continue to increase earnings at the rate that it had done over the last six years. However, the court finds that this argument is, in essence, a restatement of plaintiff's claim that Liggett was under a duty to correct the analysts' earning projections. Plaintiff does

not contest that Liggett officials thought that earnings would increase by 2 per cent in 1972 when they stated that 1972 would be a good year. The court finds that plaintiff has failed to prove that Liggett made misrepresentations about its financial condition. Therefore, plaintiff's claim on this ground is denied.

III. *Failure to Issue a Press Release in June*

Plaintiff contends that, as a matter of law, on June 19, 1972 when Liggett received the April and May preliminary earnings figures, it was under a duty to issue a press release revealing the drop in earnings. Plaintiff contends that it was deceptive of Liggett to wait until July 18 to issue a press release. Plaintiff contends that Liggett acted with *scienter* in keeping silent.

■ The court finds that Liggett did not have a duty to disclose the April and May preliminary figures because it was reasonable of Liggett, at the time, to view the drop in earnings as only temporary and not a significant change in Liggett's condition which would require a press release. *SEC v. Texas Gulf Sulphur,* 401 F.2d 833 (2d Cir. 1968), *cert. denied, sub nom. Coates v. SEC,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969); *Financial Indus. Fund, Inc. v. McDonnell Douglas Corp.,* 474 F.2d 514 (10th Cir.), *cert. denied,* 414 U.S. 874, 94 S.Ct. 155, 38 L.Ed.2d 114 (1973).

It is clear that projected earnings reports would be material information to an investor. It is also clear that Liggett had reports in its possession which it did not disclose. The question for this court is whether the reports indicated, at the time, that there was such a significant decline in earnings that Liggett was under a legal duty to disclose this to investors.

Earnings for April 1972 were reported at $.03 a share. This was a dramatic drop from the year before when April's earnings had been $.30 a share. This was also below the budget which projected earnings of $.24 a share. Plaintiff does not contend that Liggett was under a duty to disclose the April figures when it received them. As Liggett points out, the company had experienced earnings of only $.01 a share in December 1971, and 1971 had been a record year for earnings.

Earnings for May 1972 were $.23 a share. This was a significant revival from the April earnings figure at $.03. It is true that the May 1972 figures were somewhat below the earnings reported in May 1971 of $.27 a share. Plaintiff contends that even though the May figures showed a revival, that Liggett should have realized in June that 1972 earnings as a whole would be below 1971 earnings.

The court finds that it was reasonable for Liggett in June to believe that the May figures indicated that the earnings had rallied and that the June figures would show a continued rally from the April drop, just as Liggett had recovered from the low December, 1971 earnings per share. In June, earnings to date stood at $1.26 compared to a figure of $1.38 for the same period in 1971. However, due to Liggett's high first quarter earnings in 1972, which were up 17 per. cent over 1971's first quarter, Liggett's preliminary earnings were still ahead of its budgeted earnings for the period.

It is true that in March, 1972 Liggett issued a generally worded statement that the first two months of 1972 had been good months for the company. At that point Liggett was reporting on the continuation of a trend. All the information available to Liggett at that time clearly indicated that 1972 would be a good year. In June the information available to Liggett did not point to any clear trend. Therefore, Liggett did not issue a press release until July when there was sufficient information to show that earnings were going to be down. The fact that Liggett issued a generally worded statement in March on what at that time were continuing trends did not place a legal duty on Liggett to issue specific earnings figures in June.

In July when Liggett received the June figures which showed that the June earnings had dropped back to $.20 a share, a figure below the May rally of $.23 a share,

rather than continuing to rise, Liggett issued a press release the next day. Liggett based this release on the preliminary figures available to it rather than waiting for the final figures as it had always done in the past.

The court finds that Liggett was under no duty to disclose its April and May preliminary earnings figures in June. The court finds that Liggett's disclosure in July of preliminary figures for the second quarter satisfied any duty to disclose its financial condition to investors. *Texas Gulf Sulphur, supra; Financial Indus. Fund, Inc. v. McDonnell Douglas, supra.* Therefore, the court finds that plaintiff has failed to prove his claim of non-disclosure against Liggett.

## IV. *Tipping*

■ Although Liggett was under no duty to disclose its preliminary earnings figures for April and May in June, tipping of such information would be a disclosure of inside material information which would violate Rule 10b–5. As the Second Circuit stated in *SEC v. Texas Gulf Sulphur Co., supra,* at 848,

> "[T]he Rule [against tipping] is based in policy on the justifiable expectation of the securities marketplace that all investors trading on impersonal exchanges have relatively equal access to material information."

The court finds that plaintiff has proved that Liggett officials tipped material inside information, that sales of Liggett stock resulted from these tips, and that plaintiff is entitled to recover damages. Liggett is liable even though its officials were tippers who did not trade in Liggett stock themselves. *Shapiro v. Merrill Lynch, Pierce, Fenner & Smith,* 495 F.2d 228 (2d Cir. 1974).

The court finds that on July 10, 1972, Provost, an officer of Liggett, told Peter Barry, a financial analyst with Kuhn, Loeb, that there was trouble in various Liggett divisions and that Liggett would be taking the unprecedented step of issuing a press release about its earnings in a week or so. From this, Barry inferred that there would be an announcement of a significant decline in earnings. Barry Deposition at 34–37. Barry then sent a wire incorporating this information to Kuhn, Loeb's offices. John Sadler, a salesperson in the Chicago office, received the wire and, based on the wire, contacted several of his clients to recommend that they sell their Liggett stock.

One of Kuhn, Loeb's clients, Richard Schroeder, then sold 100 shares of Liggett stock after having been called by Sadler. There can be no doubt that the information that Liggett would issue a press release for the first time in its history outside of its regular reporting, and that Liggett was in trouble, was material information to an investor. This was not information available to the public. The court finds that this was an illegal tip of material inside information in violation of Rule 10b–5.

The court finds that on July 17, 1972, Moore, an officer of Liggett, told Robert Cummins, an analyst with Loeb, Rhodes & Co., that there was a good possibility that Liggett would show a decline in earnings for the second quarter but that such information was "confidential" until there was a public report. Cummins Deposition, at 17 *et seq.* Moore did not tell Cummins that there would be a press release the next day. On the same day, July 17, Cummins sent a wire containing this information. Cummins also spoke directly with Bruce Davies, a stockbroker with Benjamin Bartlett & Co. (Bartlett) in Cincinnati, and told him that Liggett's second quarter earnings would be down. Bartlett immediately sold 1,800 shares of Liggett stock for its customers. The court finds that this was a tip of material inside information in violation of Rule 10b–5.

The court finds that the other alleged tips to analysts such as Karekin Sahagian, Lawrence Smith, Arthur Baer, the firm of Newberger & Berman and Jeffrey Weingarten were not proved by plaintiff to have involved tips of material inside information. *SEC v. Bausch & Lomb, Inc.,* 420 F.Supp. 1226 (S.D.N.Y.1976), *aff'd,* 565 F.2d 8 (2d Cir. 1977). Plaintiff failed to prove that any sales resulted from the alleged tips on July 18, the day of the issuance of the press

release. *SEC v. Texas Gulf Sulphur, supra; SEC v. Lums, Inc.,* 365 F.Supp. 1046 (S.D.N.Y.1973). Therefore, plaintiff cannot recover based on these alleged tips.

The court finds that Liggett is liable to the plaintiff class from July 11, 1972, when inside information was tipped, to July 18, 1972, when this situation was cured by public release of the same information.

## V. *Damages*

▮ As the Second Circuit stated in *Shapiro v. Merrill Lynch, Pierce, Fenner & Smith,* 495 F.2d 228, 237 (2d Cir. 1974), "We hold that defendants owed a duty—for the breach of which they may be held liable in this private action for damages—not only to the purchasers of the actual shares sold by defendants (in the unlikely event they can be identified) but to all persons who during the same period purchased Douglas stock in the open market without knowledge of the material inside information which was in the possession of defendants."

The measure of damages is the difference between the price actually paid for Liggett stock by each member of the plaintiff class and the price at which Liggett stock would have sold if the tipped information had been publically disclosed. *Texas Gulf Sulphur, supra.* Plaintiff chose to use the "value" line method of damages by which a value line is calculated showing the price at which Liggett stock would have sold for each day of the damages period.

Plaintiff's expert witness, John B. Torkelsen, calculated that the price of Liggett stock would have dropped dramatically at the time of disclosure and then slowly declined until it bottomed out. Thus the value line would show a sharp drop and then a gentle downward slope. Torkelsen took into account the fluctuation of the overall market by dividing the price for Liggett common stock on the New York Stock Exchange by the Standard & Poor 500 index for each day. Torkelson calculated that if disclosure had been made on July 11 that the price of Liggett stock would have

dropped from its selling price for that day, which was $62¾, to $42.77. Torkelson then testified that the price would have declined to $41.38 on July 18. On that day Liggett stock actually sold for $55. Liggett stock actually declined to $41 on August 7, which plaintiff contends was the "bottom-out" price. The stock continued to decline to $38⅛ on December 27, 1972, the day on which Elkind sold his stock. *See* Plaintiff's Ex. 152, attached as an Appendix. Plaintiff's method of computing damages yields smaller damages that the method of using the "bottom-out" price of $41 as the actual value of Liggett stock of disclosure had been made. Thus, plaintiff's method of calculating damages is fairly conservative. *See Green v. Occidental Petroleum Corp.,* 541 F.2d 1335, 1334–6 (9th Cir. 1976) (concurring opinion), for a discussion of the "value line" method of damages.

Defendants have criticized the plaintiff's calculations, but did not propose any alternate method of formulating damages. The court holds that it will award damages based on the formula proposed by plaintiff. *Feit v. Leasco Data Processing Equipment Corp.,* 332 F.Supp. 544 (E.D.N.Y.1971).

All members of the class who purchased Liggett stock during the period July 11 to July 18, 1972 will be entitled to recover from Liggett the difference between the amount they paid for their Liggett stock, less commissions, taxes and sales charges, and the amount for which Liggett stock would have sold if Liggett had disclosed the information it tipped to analysts, as calculated by plaintiff's expert witness and embodied in Plaintiff's Exhibit 152, Appendix.

Based on the daily volume of Liggett shares sold on the New York Stock Exchange from July 11 to July 18, 1972, it can be estimated that the amount of damages recoverable by the class is approximately $791,000.

▮ The court further finds that the plaintiff is entitled to prejudgment interest in order to fully compensate the class in

# 130

view of the long delay since this action was commenced and the fact that the class will have to bear the cost of its attorney's fees, discovery costs and the fee of the expert witness. *Chris-Craft Industries, Inc. v. Piper Aircraft Corp.*, 516 F.2d 172, 191 (2d Cir. 1975), *rev'd on other grounds*, 423 U.S. 944, 96 S.Ct. 353, 46 L.Ed.2d 276 (1977).

The court will refer this case to a magistrate to supervise the awarding of damages to members of the class. Submit Order on notice.

## APPENDIX

### PL 152

CALCULATION OF DAMAGES FOR
CLASS MEMBERS WHO PURCHASED
L & M COMMON STOCK (BASED ON
DAILY CLOSING PRICES. AND ON
NEW YORK STOCK EXCHANGE VOLUME)

| 1972 Date | Normal L & M ÷ S & P500 */ | S & P500 | Normal L & M Price | Actual L&M Price | Diff.**/ | NYSE***/ Volume | Daily Damage |
|---|---|---|---|---|---|---|---|
| Jun 19 | .4210 | 108.11 | $45.51 | $64 1/2 | $18.99 | 7,800 | $148,122 |
| 20 | .4195 | 108.56 | 45.54 | 66 3/8 | 20.84 13m 1/, 000 143m | 83,360 |
| 21 | .4180 | 108.79 | 45.47 | 67 | 21.53 | 2,000 | 43,060 |
| 22 | .4165 | 108.68 | 45.27 | 66 3/4 | 21.48 | 1,700 | 36,516 |
| 23 | .4150 | 108.27 | 44.93 | 66 3/4 | 21.82 | 6,600 | 144,012 |
| 26 | .4135 | 107.48 13m | 44.44 | 65 3/4 | 21.31 | 3,500 | 74,585 |
| 27 | .4120 | 107.37 | 44.24 | 65 1/2 | 21.26 | 3,800 | 80,788 |
| 28 | .4105 | ·107.02 | 43.93 | 65 3/8 | 21.45 | 3,200 | 68,640 |
| 29 | .4090 | 106.32 | 43.69 | 64 7/8 | 21.19 | 2,000 | 42,380 |
| 30 | .4075 | 107.14 | 43.66 | 65 7/8 | 22.22 | 3,600 | 79,992 |
| Jul 3 | .4060 | 107.49 | 43.64 | 65 3/4 | 22.11 | 2,200 | 48,642 |
| 5 | .4045 | 108.10 13 m | 43.73 | 66 3/4 | 23.02 | 1,000 | 23,020 |
| 6 | .4030 | 108.04 13m | 43.54 | 64 1/2 13m | 20.59 | 9,800 | 201,782 |
| 7 | .4015 | 108.69 13m | 43.64 | 64 1/4 | 20.61 | 7,100 | 146,331 |
| 10 | .4000 | 108.11 13m | 43.24 | 64 | 20.75 | 3,200 | 66,400 |
| 11 | .3985 | 107.32 | 42.77 | 62 3/4 | 19.98 | 3,400 | 67,932 |
| 12 | .3970 | 106.89 | 42.44 | 62 1/2 | 20.06 | 10,600 | 212,636 |
| 13 | .3955 | 106.28 | 42.03 | 61 3/8 | 19.35 | 5,800 | 112,230 |
| 14 | .3940 | 106.80 | 42.08 | 60 | 17.92 | 6,000 | 107,520 |
| 17 | .3925 | 105.88 | 41.56 | 55 1/4 | 13.69 | 10,200 | 139,638 |
| 18 | .3910 | 105.83 | 41.38 | 52 1/2 | 11.12 | 13,600 | 151,232 |
| Total | | | | | | 107,500 | $2,003,794 |

13m +78,024

13m $2,078,818

(Footnotes Omitted)

---

## OPINION AMENDING FINDINGS OF FACT AND CONCLUSIONS OF LAW

Defendant Liggett & Myers, Inc. (Liggett) has timely moved to amend the findings of fact and conclusions of law entered by this court on November 17, 1978. This court found that plaintiffs had failed to meet their burden of proof on their first claim of nondisclosure. The court found for plaintiffs on their second claim of tipping. As set out in this court's earlier opinion, the court awarded plaintiffs damages equivalent to the difference between what the plaintiffs paid for their stock and the value they received—that is, what they would have paid had there been disclosure of the tipped information at the time they bought Liggett stock. The present controversy centers on the calculation by the court of what the stock would have sold at during the tipping period if there had been disclosure of the tipped information. The court

used the "value line" method as suggested by Judge Sneed in *Green v. Occidental Petroleum Corp.,* 541 F.2d 1335, 1341 (9th Cir. 1976) (concurring opinion). The court constructed a value line which showed what the price of Liggett stock would have been for each day of the tipping period if the tipped information had been publicly disclosed on the first day of the tipping period.

Defendant does not quarrel with the value line method but rather contends that there was insufficient evidence to construct a value line for Liggett stock during the tipping period, July 11 through July 18, 1972. Liggett argues that plaintiffs' Exhibit 152, which was attached to this court's earlier opinion as an appendix, and the testimony of Mr. Torkelson, plaintiffs' expert witness, with respect to Plaintiffs' Exhibit 152 were relevant only to plaintiffs' first claim of nondisclosure which was dismissed by the court. It was this evidence on which the court based its award of damages. The court agrees that Plaintiffs' Exhibit 152 was not probative on the issue of damages under the tipping claim and amends its earlier opinion in accordance with this opinion.

Plaintiffs' Exh. 152 estimated what the price of Liggett stock would have been had there been disclosure in June 1972 of Liggett's internal reports which indicated a down swing in profits. Plaintiffs' Exhibit 152 showed the estimated price of Liggett stock for each day of the period June 19 to July 18, the day Liggett issued a press release disclosing the anticipated dip in profits. It was plaintiffs' first claim that Liggett had "puffed" the value of its stock by overestimating its projected earnings during the winter and spring. Plaintiffs claimed that Liggett was under a duty to disclose its internal reports in June. As Liggett now points out, Mr. Torkelson's testimony about the value line and Plaintiffs' Exh. 152, which summarized his testimony, was based on the premise that Liggett breached its duty in June, 1972. Since the court explicitly declined to make that finding, the testimony based on that premise is without evidentiary value on the question of damages on the tipping claim. There-

fore the court finds that it cannot rely on Plaintiffs' Exh. 152 as evidence of the value line of Liggett stock during the tipping period.

Plaintiffs now argue that the court should rely on other testimony of Mr. Torkelson which was given in answer to a question about what the price of Liggett stock would have been had there been public disclosure at the time of the illegal tips. Mr. Torkelson stated:

> ". . . I believe that the stock would have gone down substantially.
>
> It eventually went down to a price in the low 40-dollar area, approximately $42 a share, and it is my opinion that approximately half of that decline from $64 a share, which the stock was selling at at that time, to $42, which is a $22 decline, half of that would have occurred promptly, $11 a share. The stock would have sold at a price of $53.

Q. And on the date July 11 through July 18, 1972?

A. On July 11, additional information became available and the stock would have continued to sell off. We are dealing with a period July 11 through 18, which represents six trading days. The stock, in order to reach its final level, had to go down approximately 12 more points. It is my opinion that it would have gone down 2 points each day."

(Tr. 457–8).

Unlike Plaintiffs' Exh. 152, this testimony is clearly relevant to the issue of damages under the tipping claim. However, the court finds that Mr. Torkelson's testimony on this point is speculative and is not supported by the evidence in the record. Therefore the court will not construct a value line for Liggett stock based on this testimony.

Liggett argues that since plaintiffs have failed to introduce sufficient evidence to allow the court to construct a value line for Liggett stock during the July 11-July 18

period, that plaintiffs have failed to prove damages with adequate certainty and cannot recover. Alternatively, Liggett proposes a calculation of a value line that would yield an award of approximately $279,000, a significantly smaller amount than the approximately $791,000 awarded by the court in its earlier opinion.

Few § 10b–5 cases have gone to judgment. Consequently, the law on the method of calculating damages for a defrauded purchaser in a tipping case is still in flux. This court is not bound to deny recovery because the plaintiffs have failed to prove a value line in accordance with Judge Sneed's concurring opinion in *Green v. Occidental Petroleum Corp.*, 541 F.2d 1335, 1341 (9th Cir. 1976), if there is sufficient evidence from which the court can calculate damages based on a different method.

The court ordered the parties to brief the issue of computing damages by the method suggested by the Tenth Circuit in *Mitchell v. Texas Gulf Sulphur Co.*, 446 F.2d 90 (10th Cir.), *cert. denied*, 404 U.S. 1004, 92 S.Ct. 564, 30 L.Ed.2d 558 (1971). The court also referred the parties to an article, *Damages under Rule 10b–5*, 28 U.Fla.L.Rev. 76, 98 (1975). The court then held oral argument on the question.

In *Mitchell, supra,* the Tenth Circuit awarded the plaintiffs, who were defrauded sellers, the difference between the price at which they sold their Texas Gulf Sulphur stock and the price at which they would have sold their stock had there been full disclosure of the favorable prospects of the company. The court stated that it would calculate the latter price as the highest price to which the stock rose after the actual disclosure. The court held that it would consider how long it would take a reasonable investor to become apprised of the information disclosed in the press release, and look to the highest price to which the stock rose during the period up to that day from the day of disclosure. In other words, the Tenth Circuit looked to the actual market price of the stock after the disclosure rather than constructing an artificial value line for the stock. This yielded one figure for the value of the stock during the tipping period rather than a sloping value line with a different value or price for each day of the tipping period. The Tenth Circuit stated one of its rationales for this method:

> "The award proposed would permit one to 'cover' by reinvestment and suffer neither loss nor forced sale." (at 105).

As one commentator has noted, the "cover" rationale of the award "is inapplicable to the [defrauded purchaser] situation because the plaintiffs, if they no longer hold the stock would not wish to buy back into the market." *Rule 10b–5 Damages, supra,* 98. However, the reasoning of the Tenth Circuit that the actual price of the stock immediately after disclosure may be a good measure of the price that the stock would have sold at had there been disclosure a short time earlier absent unusual market conditions is applicable to the defrauded buyer situation present here. "Applying the reasonable investor criteria of *Mitchell,* . . . the parallel recovery in a defrauded buyer case would be the difference between the purchase price and the lowest market price within a reasonable period after the investor should have become apprised of the facts." *Id.*

■ The court finds that the price which plaintiffs would have paid for their stock in the period July 11-July 18, given the absence of unusual market conditions, and given the short period of time involved, can be inferred from the price which investors did pay for Liggett stock after they had absorbed the news contained in the Liggett press release of July 18. *Mitchell, supra.* Since Liggett's wrongdoing "has made difficult a more precise proof of damages, it must bear the risk of uncertainty created by its conduct." *Lee v. Joseph E. Seagram & Sons, Ltd.,* 552 F.2d 447, 455 (2d Cir. 1977).

The court must next decide how long it would have taken a reasonable investor to

become apprised of the information contained in the press release issued on July 18.

*Mitchell, supra,* has been criticised for using the standard of the time it would take a reasonable investor, rather than the market, to absorb the information disclosed. *The Measurement of Damages in Rule 10b–5 Cases Involving Actively Traded Securities,* 26 Stanford L.Rev. 373, 379–381. Under the facts of the instant case, the court does not find this distinction significant.

During the period July 11 to July 18, the price of Liggett stock fell from a closing price of $62¾ on July 11 to $55¼ on July 17, the day before the press release. On July 18, Liggett stock opened at $55⅝. The press release was distributed at 2:15 that Tuesday afternoon. The stock closed at $52½ at 3:30 P.M. The *Wall Street Journal* published an article on the release on July 19. The *New York Times* did not publish an article about it. By Friday of that week the price of Liggett stock had fallen to $46¼. By the end of the next week, on July 28, eight trading days later, the stock had fallen to $43. The price continued to fall to $40⅛ on August 3 and did not reach $43 again until August 22. The price continued to fall. Plaintiff Elkind sold his stock on December 27, 1972 at $38⅛.

In *Mitchell,* the district court found that it would take a reasonable investor seventeen trading days to become apprised of the information contained in the Texas Gulf Sulphur press release.

The Tenth Circuit suggested that it would have found that a reasonable investor would have become apprised of the information within nine trading days in light of the extensive publicity which the press release received. The Tenth Circuit affirmed the lower court's result in that respect since under the facts of the case the result was the same whether the chosen time period was nine or 17 trading days.

In the instant case, although the press release did not receive as much attention as

did the release in *Mitchell,* the court finds that eight trading days is sufficient time to allow the market or a reasonable investor to become apprised of the new information. The court will therefore award damages based on the price of $43, which is the lowest closing price for Liggett stock during the eight trading days following the press release on July 18. Plaintiffs will be entitled to the difference between the price that they paid for Liggett stock purchased between July 11 and July 18 and $43 a share.

Liggett urges this court to limit damages on the ground that it would be unfair to impose a "Draconian liability" on the corporation. In *Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 495 F.2d 228 (2d Cir. 1974), the Second Circuit while not reaching the issue of damages, set out several factors for the district court to consider in shaping relief. In *Shapiro,* plaintiffs contended that they had been defrauded in their purchases of Douglas Aircraft stock and that there had been illegal tips. The Second Circuit stated:

"Other questions bearing upon the appropriate form of relief which must await trial include the extent of the selling defendants' trading in Douglas stock, whether such trading effectively impaired the integrity of the market, what compensation if any was paid by the selling defendants to Merrill Lynch for the inside information, what profits *or other benefits* were realized by defendants, what expenses were incurred and what losses were sustained by plaintiffs, and what should be the difference, if any, in the extent of the liability imposed on the individual defendants and the selling defendants, respectively . . . . In leaving to the district court the fashioning of appropriate relief, including the proper measure of damages, we are not unmindful of the arguments pressed upon us by all defendants that the resulting judgment for damages may be very substantial in amount—in the words of defend-

ants' counsel, a "Draconian liability". This is an additional reason for leaving to the district court the appropriate form of relief to be granted . . . ." (at 242) (emphasis added)

The court has considered these and other factors and finds that the award of damages is not an excessive liability to impose on Liggett for the conduct involved and is necessary to effectuate the purpose of 10b–5 as well as to partially compensate the plaintiffs for the losses which they suffered.

Based upon the volume of stock transactions during the July 11-July 18 period, and the closing price for the stock on each day, the court estimates that at most the amount that plaintiffs will recover is approximately $740,000. (See Appendix). Evidence at trial showed that Liggett's net operating profits for 1971 and 1972 were, respectively, $35,374,000 and $31,274,657. The damages in *Mitchell, supra,* were estimated by the court to be $14 million dollars. *Mitchell, supra,* at 105 n.13. If past experience is a guide, the chances are that due to the lapse of time not all members of the plaintiff class will come forward to prove their claims. *Beecher v. Able,* 435 F.Supp. 397 (S.D.N.Y.1977). The court will order that any amount of the damage award which is not claimed by October 1, 1979 will be returned to the corporation. In light of these findings, the court does not consider the damage award to be a "Draconian liability".

Liggett contends that it did not benefit financially from the tips to financial analysts. However, the court finds that Liggett acted in order to obtain other benefits. *Shapiro, supra.* There was evidence that Liggett started a public relations campaign to cultivate good relationships with selected financial analysts who followed Liggett. In 1972 these analysts were projecting earnings for Liggett which were far too optimistic. In its earlier opinion the court held that Liggett was under no legal duty in June 1972 to correct the mistaken impressions of the financial analysts as to Lig-

gett's projected earnings. Nonetheless, Liggett knew when it issued the press release that the financial analysts were going to be taken by surprise and that they would have to revise their analysis of Liggett for their customers. Liggett also realized that its credibility as to its future statements about its financial condition would be weakened. In order to avoid this result and to save from embarrassment the selected analysts with whom it had worked to maintain a good relationship, Liggett tipped the information to selected analysts before disclosing the information to the investing public. Thus Liggett acted to obtain a benefit although not one of a financial kind. As the Second Circuit stated in *Shapiro, supra,*

> "As we have stated time and time again, the purpose behind Section 10(b) and Rule 10b–5 is to protect the investing public and to secure fair dealing in the securities markets by promoting full disclosure of inside information so that an informed judgment can be made by all investors who trade in such markets." (at 235).

Here Liggett chose to maintain its ties to leading financial investors at the expense of the investing public who bought Liggett stock during the tipping period unaware of the tipped material inside information.

Liggett also contends that the damages should be limited since plaintiffs purchased in an impersonal market and there was no evidence that the market was impaired by the tips. However, there was evidence that the market price of Liggett stock dropped ten points during the period July 11 to July 18.

Furthermore, defendant's reliance upon *Fridrich v. Bradford,* 542 F.2d 307 (6th Cir. 1976), is misplaced for several reasons. The Sixth Circuit explicitly rejected the contention made by defendant here that it should limit the amount of damages assessed on the ground of equity. The Sixth Circuit discussed a rule of limitation of damage contained in the proposed ALI Federal Se-

curities Code, § 1402(f)(2)(B) (Tent. Draft No. 2 March 1973), and stated:

"As compared to Congress or administrative agencies such as the SEC, we think the courts are ill-fitted to the task of rulemaking which would be required". (at 322).

Furthermore, the Sixth Circuit refused to follow the Second Circuit's holding in *Shapiro v. Merrill Lynch, supra,* by which this court is bound, with respect to the question of causation in an impersonal market when damage is claimed to have resulted from insider trading. *Fridrich, supra,* at 316–20. The Sixth Circuit stated that it would be more likely to impose liability in a case of illegal tipping, such as was alleged in *Shapiro* and here than in the case of insider trading, as was alleged in *Fridrich.* The court stated:

"Tipping because it involves a more widespread imbalance of information presents an even greater threat to the integrity of the marketplace than simple insider trading. Tipping, by its very nature, is a more open-ended violation than that of the insider who enters the market, trades on his own account and withdraws." (at 327 n. 12).

The court finds that this factor does not require limitation of damages.

The award of damages in this action will not fully recompense all the plaintiffs. For example, Elkind will be able to recover only the difference between what he paid and the price of $43 a share, not the lower price at which he eventually sold the stock, $38⅛.

In light of the amount of the award in relation to the financial status of Liggett, the harm to plaintiffs, and the nature of the conduct involved, the court does not find the imposition of a possible maximum of approximately $740,000 a "Draconian liability".

Defendant has also moved to limit recovery to those plaintiffs who purchased Liggett stock before 2:15 P.M. on July 18, the moment at which Liggett issued its press release. Plaintiffs ask recovery for class members who purchased Liggett stock through the close of the market at 3:30 P.M. on July 18. In light of the Second Circuit's holding that the critical time is the point at which the information is "effectively disseminated" rather than when a press release is issued, defendant's motion is frivolous. *Shapiro, supra,* at 242; *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 854 n. 18 (2d Cir. 1968), *cert. denied, sub nom. Coates v. SEC,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). It was not until the next day, July 19, that the story was reported in the *Wall Street Journal.* The press release did not receive the attention that the press releases did in *Texas Gulf Sulphur* or *Shapiro.* Without deciding at what point the release was effectively disseminated, the court finds that it is clear that it had not been effectively disseminated at the moment of its release at 2:15 and that plaintiffs who purchased through the rest of the day on July 18 are entitled to recover. *Shapiro v. Merrill Lynch,* 1975 CCH Fed.Sec.L.Rep. ¶ 95,337 (S.D.N.Y.1975) at 98, 878.

In summary, the court amends its earlier findings of fact and conclusions of law to provide that the measure of damages will be the difference between the price paid by the plaintiffs who purchased Liggett stock between July 11 and the close of the day on July 18 and the price which they would have paid had there been disclosure of the tipped information, that is $43 a share. Any amount of the damage award which is not claimed by the plaintiffs by October 1, 1979 will revert to the treasury of the corporation.

Appendix to follow.

**136**

A P P E N D I X

| L. & M. CLOSING PRICE | | PER SHARE DAMAGE BASED ON $43 | VOL. | DAILY EST. DAMAGE |
|---|---|---|---|---|
| July 11 | $63¾ | $20¾ | 3,400 | $70,550 |
| July 12 | $62½ | $19½ | 10,600 | $206,700 |
| July 13 | $61⅜ | $18⅜ | 5,800 | $106,604 |
| July 14 | $60 | $17 | 6,000 | $102,000 |
| July 17 | $55¼ | $12¼ | 10,200 | $124,950 |
| July 18 | $52½ | $9½ | 13,600 | $129,200 |
| | | TOTAL | 49,600 | $740,004 |