**J. G. RUBENSTEIN**

v.

**IU INTERNATIONAL CORPORATION et al.**

Civ. A. No. 79–4268.

United States District Court, E. D. Pennsylvania.

Dec. 30, 1980.

Harold E. Kohn, Herbert E. Milstein, and Samuel E. Klein, of Kohn, Savett, Marion & Graf, P. C., Philadelphia, Pa., for plaintiff.

Morris E. Brooke, Stewart Dalzell and Timothy C. Russell, of Drinker, Biddle & Reath, Philadelphia, Pa., for defendants.

## OPINION

LOUIS H. POLLAK, District Judge.

Plaintiff has brought this action to recover money damages for injuries allegedly suffered by him as a consequence of (1) defendants' alleged violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Act"), 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder by the Securities and Exchange Commission; (2) defendants' alleged violations of section 14(a) of the Act, 15 U.S.C. § 78n(a), and Rule 14a–9 promulgated thereunder by the Securities and Exchange Commission; and (3) the alleged breach by the defendant directors of IU International Corporation ("IU") of fiduciary duties owed by them to the plaintiff under state law. The jurisdiction of this court is based, as to the first two claims, on section 27 of the Act, 15 U.S.C. § 78aa, as amended, 28 U.S.C. § 1337, and, as to the state law claim, upon the doctrine of pendent jurisdiction.

### A.

Plaintiff, J. G. Rubinstein, a former president of defendant IU International Corporation ("IU"), owned approximately 22,700 shares, preferred and common, in defendant IU in November 1979. Early in that month, Rubinstein received by mail a notice of a special meeting of IU's stockholders to be held on November 27: The business to be considered at this meeting was a proposal, unanimously recommended by IU's directors, to authorize the IU directors to spin-off IU's wholly-owned subsidiary, Gotaas-Larsen Shipping Corporation ("GLSC").

GLSC was, at the time, a Liberian corporation with its principal place of business in Bermuda, with assets which constituted approximately 40% of the total assets held by IU. Under the proposed plan, which was described at length in a prospectus and proxy statement accompanying the notice of the special meeting, each shareholder of IU common stock would receive one share of GLSC stock for every three shares of IU common stock which s/he held as of the record date. As a part of the reorganization, the proposal called for the amendment of the articles of incorporation of GLSC in such a manner as substantially to limit the voting rights of GLSC shareholders: Under the amended articles, it would require 90% of the GLSC shareholders—scaled down over a period of some years to 65%—to adopt corporate policies or to elect directors not favored by the incumbent board.

Rubinstein found the spin-off proposal—and in particular the curtailment of GLSC shareholder voting rights—so disturbing that he consulted his attorneys. On November 21, six days before the date of the special meeting, IU received a letter from Rubinstein's attorneys challenging the proposal and indicating that litigation would ensue unless the special meeting were delayed. The special meeting was held as scheduled and the spin-off proposal was approved by a favorable vote of 97% of the votes cast, with about two-thirds of the shares voting. A meeting of IU directors promptly followed, and the directors gave their final approval of the proposal. By noon of the same day, the IU directors who were to be directors of the reorganized GLSC flew to Bermuda and held the first meeting of the GLSC board of directors. By the end of that day, everything had been accomplished to complete the spin-off except for (1) the distribution of GLSC shares to IU shareholders and (2) the drawdown of a $30,000,000 line of credit which IU was to grant GLSC.

On November 26, one day before the special meeting, Rubinstein filed his complaint in this lawsuit, naming IU and the individu-

al members of IU's board of directors as defendants. On November 30, he amended his complaint to seek an injunction against consummation of the transaction; at the same time he filed an application for a temporary restraining order, based on his 14(a) claims alone, aimed particularly at blocking the imminent distribution of GLSC shares. The application for a temporary restraining order was converted into an application for a preliminary injunction. After an evidentiary hearing, that application was denied for reasons explained in a bench opinion on December 13, 1979. The distribution of GLSC shares proceeded forthwith. About a month later—in January of this year—Rubinstein sold his shares of GLSC stock at a price of approximately $6⅛ per share; in May he sold his IU stock at a price of approximately $16 per share.[1]

### B.

Now before the court is defendants' motion to dismiss the complaint, or, in the alternative, for summary judgment—a motion putting squarely in issue the viability of Rubinstein's claims:

Rubinstein alleges that (1) the proxy materials contained various material omissions and misrepresentations, and (2) as a result of the spin-off—and in particular because of the limited shareholder rights in GLSC and the fact that GLSC is an off-shore corporation—the value of his combined holdings of IU and GLSC stock was materially less than the value of his old IU stock. Defendants argue that they are entitled to summary judgment because (1) there was complete disclosure of all material facts, and (2) plaintiff has failed to show that he suffered any actual damages as a result of the spin-off.[2]

---

1. The exact selling price is not in the record, but the record does show what the prevailing market prices were at the times in question.

2. Defendants also argue that (1) the complaint failed to allege fraud with sufficient specificity to satisfy Federal Rule 9(b), and (2) plaintiff has failed to allege the scienter required under

*The Alleged Misrepresentations and Omissions*

Plaintiff's 10(b) and 14(a) claims are based on alleged omissions and misrepresentations in the proxy materials. As the test of whether proxy materials are materially deceptive within the meaning of 10(b) is congruent with the test for materiality within 14(a), *Kohn v. American Metal Climax, Inc.*, 458 F.2d 255, 269 (3d Cir. 1972); *Allen v. Penn Central Company*, 350 F.Supp. 697, 706 (E.D.Pa.1972), the following discussion of the alleged deficiencies in the proxy materials will be directed toward both plaintiff's 10(b) and 14(a) claims.

Plaintiff alleges that the proxy materials were deficient in several respects: These will be considered in turn.

(1) *Plaintiff alleges that defendants used the term "dividend" to describe the distribution of GLSC stock, whereas the transaction would in fact diminish the value of the shareholders' investment.*

■ The proxy materials consistently refer to the transaction in terms of a "distribution" by IU to its shareholders of the stock of GLSC. The plan is described in detail in several places, including twice in the first two pages of the materials. In none of these descriptions do the materials suggest that the shareholders would receive anything other than shares already owned by IU, and hence by the shareholders themselves. To be sure the materials do not suggest that the combined holdings of GLSC and IU stock would be worth less than an equivalent holding of the old IU stock: But such a statement would be a prediction as to future value. As the disclosure of facts was complete and accurate, defendants would appear to be entitled to summary judgment on this issue. *Ash v. LFE Corporation*, 525 F.2d 215 (3d Cir. 1975).

---

10(b). The allegations of fraud are sufficiently precise to enable defendants to prepare their defense, thus satisfying the requirements of Rule 9(b). *Denny v. Carey*, 72 F.R.D. 574 (E.D. Pa.1976). Plaintiffs have also alleged sufficient knowing conduct on the part of the IU board to satisfy the pleading requirement of 10(b).

(2) *Plaintiff alleges that defendants falsely represented that a major motivation for the proposal was the volatile financial experience of IU's Shipping Group, which defendants attributed to the cyclicality of the international shipping business.*

■ Sections 10(b) and 14(a) are aimed at the complete disclosure of facts: They do not mandate the disclosure of purposes or motives. *Biesenbach v. Guenther*, 588 F.2d 400 (3d Cir. 1978). But where the management chooses to disclose a purpose for a transaction, it is consistent with the purposes of the securities laws to require that such disclosure be honestly made. It seems extremely unlikely on the present record, which includes depositions of three officers of IU, that plaintiff will be able to establish the falsity of the statement made in the proxy materials. This does, however, present a contested issue of fact, so summary judgment would not be warranted.

(3) *Plaintiff alleges that the proxy materials failed to state that "a purpose of the distribution was to enable some of the officers and directors of IU to conduct a business away from the scrutiny and surveillance of the regulatory agencies of the U.S. government."*

The securities laws do not require the disclosure of motives and purposes. *Biesenbach v. Guenther, supra.* The proxy materials emphasize that GLSC would be an off-shore corporation, and that this would have the effect of insulating the GLSC management from the regulatory jurisdiction of the United States. This allegation does not appear, therefore, to ground a federal cause of action.

(4) *Plaintiff notes that the proxy materials state that, right after the special meeting of shareholders on November 27, the IU directors would go over the spin-off proposal once again—and, if such review so dictated, defer or even abandon its implementation—whereas, in fact, the ten directors rushed to a judgment of approval immediately following the special meeting pursuant to only the most cursory discussion. Plaintiff therefore alleges that the representation that the directors would review*

*the proposal after the special meeting was cosmetic disingenuity.*

There is no doubt that the directors acted with great rapidity following the meeting. Defendants point out, however, that the materials indicated that the directors expected to act "promptly." And defendants further assert that the review procedure was meant as a fail-safe device, which was to result in non-approval only if the directors perceived a substantial change in circumstances.

■ That plaintiff can, at a plenary hearing, persuasively establish his claim of disingenuity seems unlikely. Nonetheless, it cannot be said that there is no issue of fact to be explored, so summary judgment as to this claim would seem inappropriate.

■ (5) Finally, a careful scrutiny of the complaint reveals several other allegations of non-disclosure or misrepresentation. Defendants are entitled to summary judgment on all of these allegations on the ground that the relevant facts were fully and honestly disclosed: they are (1) inadequate disclosure of the curtailment of the shareholders' franchise; (2) inadequate disclosure of the foreign situs of incorporation of GLSC; (3) the alleged lack of viability of GLSC (the proxy materials contained full disclosure of the financial reports of GLSC—the only factual disclosure required on this point); (4) the failure to disclose the "expected deleterious impact" of the spin-off; such judgments need not be disclosed. *Alabama Farm Bureau Mut. Cas. Co., Inc. v. American Fidelity Life Ins. Co.*, 606 F.2d 602, 610 (5th Cir. 1979), *cert. denied*, 446 U.S. 933, 100 S.Ct. 2149, 64 L.Ed.2d 785 (1980).

Thus—assuming plaintiff's claims to be in other respects viable—summary judgment would appear appropriate as to all the allegations of non-disclosure and misrepresentation except for (1) the alleged misrepresentation as to the cyclicality of IU's Ocean Shipping Group, and (2) the alleged misrepresentation as to the expected review of the spin-off proposed by the IU board after the special meeting.

*Plaintiff's Damages*

Defendants also seek summary judgment on plaintiff's 14(a) and 10(b) claims on the ground that plaintiff has not suffered "actual damages", 15 U.S.C. § 78bb.

Plaintiff argues that he needs more discovery to develop a "definitive damage theory"; he premises this argument on two possible theories:

(1) Plaintiff argues that actual damages under either 14(a) or 10(b) may include more than the difference in market value between the pre-spin-off IU stock and the post-spin-off combined holding of IU and GLSC stock.

(a) Plaintiff's 14(a) claim.

 Plaintiff argues that under 14(a) actual damages include the loss of a possible profit. *Gould v. American-Hawaiian S.S. Co.*, 535 F.2d 761, 781 (3d Cir. 1976). He states that if the proposal had not been approved, the shareholders would have retained their original IU stock, which had a full panoply of shareholder rights. He then argues that the lost profit should be measured by the difference between the value of the GLSC stock as distributed and *the value the GLSC stock would have had if it had also possessed a full panoply of rights.*[3] But, if the transaction had not been approved, plaintiff would have had his original IU stock, not the hypothetical GLSC stock. Plaintiff's damages must be measured by the difference in value between the original IU stock he would have retained but for the alleged fraud and the combination of IU and GLSC stock he received in the allegedly fraudulently induced transaction. In addition he may receive the value of lost profits—"unless the loss is wholly speculative":

[W]hile the Act speaks in terms of "actual" damages the dichotomy is between actual and punitive damages and recovery is not limited to out of pocket loss, a diminution in the value of one's investment, but may include loss of a possible profit or benefit, an addition to the value of one's investment, unless the loss is wholly speculative.

*Gould v. American-Hawaiian S.S. Co., supra*, at 781. Thus damages based on lost profits have been granted: (1) where some favored shareholders were paid more for their shares than the others—without disclosure of the premium (the court reasoning that with disclosure the shareholders could have negotiated to share the premium that had been paid, *Gould v. American-Hawaiian S.S. Co., supra*); and (2) where there was a failure to disclose assets (the court reasoning that the shareholders could have received an additional amount measured by the value of the hidden assets, *Gerstle v. Gamble-Skogmo, Inc.*, 478 F.2d 1281 (2d Cir. 1973)). In contrast, plaintiff can point to no missed opportunity for profit here: He can at best argue that he was entitled to a control premium. This will not support a claim for lost opportunity for profit inasmuch as it is "too speculative." Compare *Umbriac v. Kaiser*, 467 F.Supp. 548, 556 (D. Nevada 1979). Moreover, it should be noted that here, as against the cases cited above, the loss of control was clearly disclosed in the materials.

(b) Plaintiff's 10(b) claims.

 Plaintiff also argues that he is entitled to more than the difference in market price between the old IU stock and the combined IU/GLSC stock in damages for his 10(b) claim. Under 10(b), a seller of stock who is defrauded by the buyer may recover the difference between the fair market value of what he received for his stock and what he would have received had there been no fraud. In this instance, this

---

**3.** Plaintiff claims that this value can be calculated by using the "value line method". In support of this contention, he cites *Elkind v. Ligett & Myers, Inc.*, 472 F.Supp. 123 (S.D.N.Y. 1978). In *Elkind* the total loss in value of the affected stock was known: the value line method was used to interpolate the loss in value for each day in the period that the facts were suppressed, to yield a conservative damage figure for sales that occurred within that period. *Elkind* does not support the use of the value line method to predict future values of hypothetical stock. More importantly, plaintiff's argument fails to address the major flaw in his theory: the fact that it is based on a hypothetical transaction.

would be the difference between the fair market value of the combined GLSC/IU stock and the fair market value of the old IU stock.[4] In addition a defrauded seller of stock may require the buyer to disgorge any additional profit the buyer might have made by a subsequent sale of the same securities. *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 155, 92 S.Ct. 1456, 1473, 31 L.Ed.2d 741 (1972). This result has been justified by a theory of unjust enrichment, *Rochez Bros., Inc. v. Rhoades*, 491 F.2d 402 (3d Cir. 1974), and has no applicability to the facts presented in this case.

As plaintiff has been unable to demonstrate that there is any possibility that he can show either a lost opportunity for profit which is not wholly speculative under 14(a), or that defendants made a profit upon resale of the old IU stock which they can be required to disgorge under 10(b), he is limited, as to a theory of damages, to the difference between the value of his old IU stock and that of the combination of IU and GLSC stock which he received in the spin-off transaction.

(2) Plaintiff argues that even if he is restricted to the difference in value of the two holdings of stock, he would be able to show that he was damaged if he were allowed to use certain dates to measure his damages. He suggests, for example, that if he is allowed to use the record date, October 5, 1979, to value his IU stock, and November 27, 1979, the date of the special meeting, to value the combined GLSC/IU stock, he could show a loss.[5]

The value of stock is best established by averaging its market value during the relevant period: neither party can choose to peg the value to market prices on a particular day with aberrantly high or low prices.

We must now decide what period of time should be used in calculating a price ratio between each corporation's stock. Since prices from the period immediately preceding the merger are the most likely to reflect the actual value of each corporation at the time the merger was consummated, we begin with a presumption that a short period is appropriate. Accordingly, we hold that the average market value for approximately the six month period preceding the merger should be used unless there are special factors indicating that this period is unreliable. Six months is long enough so that very short term price fluctuations will not play an unfairly important role and short enough so that the calculated ratio does not reflect business conditions that have substantially changed as of the time of the merger. *Mills v. Electric Auto-Lite Co.*, 552 F.2d 1239, 1246 (7th Cir. 1977), *cert. denied*, 434 U.S. 922, 98 S.Ct. 398, 54 L.Ed.2d 279 (1977). Analysis of the average market prices[6] of these shares over the relevant periods shows that the value of the combined holdings of IU/GLSC stock[7] exceeded the value of the old IU stock which it replaced: (1) In the two-month period immediately preceding the first press release (June 1, 1979) about the proposed spin-off, IU stock traded at prices between 11.875 and 14.000, with an average price somewhat below 13. (2) Following the press release, the price re-

4. Plaintiff may also be considered to be a purchaser, in the spin-off transaction, of the combined holding of IU/GLSC stock. His damages under 10(b) would then be the difference between the value of what he paid for his stock and the value of the stock which he received—i. e. the same measure of damages that he would receive as a seller of the old IU stock.

5. Plaintiff offers no logical reasons for the choice of these dates in preference to any others during that period, and in fact there would appear to be little reason to choose this set of dates other than the fact that this is one of the few choices which would result arithmetically

in establishing that plaintiff suffered a loss in the transaction.

6. These prices are based on weekly price quotation listings in the Wall Street Journal.

7. IU shareholders were issued one GLSC share for every three IU shares which they owned. Accordingly, for purposes of comparison with the old IU stock, the value of the combined IU/GLSC stock was calculated by adding the value of one share of IU to one-third the value of one share of GLSC.

mained reasonably constant until the week of the special shareholders' meeting on November 27. Thus, the stock traded between a high of 14.500 on October 5, 1979 [this is the value contended for by plaintiff: it should be noted that this occurred only once; the next highest value being 13.500], and a low of 11.750 on July 20, 1979,—the average over the six-month period from June 1 to November 27 again being somewhat below 13. (3) In December, the value of the combined holding of IU/GLSC dropped from 13.458 to 12.25 [8] in one week: This was the period during which plaintiff was attempting to enjoin the distribution of GLSC stock. (4) By January 18, 1980—a month after the denial of a preliminary injunction—the combined holding reached 14.75. Thereafter, except for one week (the week of March 28, when it traded at 12.-417), it traded above 13, and usually well in excess of 14. As of August 8, it was trading at about 18.[9] Plaintiff himself apparently sold his combined shares at an aggregate price well in excess of 18—a substantial profit over the value of the old IU stock for which he received the combined GLSC/IU stock.

Plaintiff has failed to adduce evidence—and has demonstrated no likelihood that he could adduce evidence at trial—that he suffered actual damage within 15 U.S.C. § 78bb. That failure is fatal to plaintiff's federal causes of action. In the order filed together with this opinion, defendants' motion for summary judgment will therefore be granted as to plaintiff's 10(b) and 14(a) claims.

### Plaintiff's Claim for Breach of Fiduciary Duty

Plaintiff alleges that the individual defendants breached their fiduciary duty towards their shareholders in that they recommended the spin-off transaction. This is a claim arising under state law, and plaintiff relies on pendent jurisdiction to bring it before this court. The exercise of pendent jurisdiction is discretionary:

That power need not be exercised in every case in which it is found to exist. It has consistently been recognized that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right. Its justification lies in considerations of judicial economy, convenience and fairness to litigants; if these are not present a federal court should hesitate to exercise jurisdiction over state claims, even though bound to apply state law to them, *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188. Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well. Similarly, if it appears that the state issues substantially predominate, whether in terms of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy sought, the state claims may be dismissed without prejudice and left for resolution to state tribunals.

*United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). Since plaintiff's federal claims are now to be dismissed at an early stage of the litigation, considerations of comity as well as judicial economy militate against the exercise of jurisdiction over the state law claim. *Tully v. Mott Supermarkets, Inc.*, 540 F.2d 187 (3d Cir. 1976). In the accompanying order, plaintiff's state law claim is, therefore, dismissed without prejudice.

---

**8.** After shareholder approval of the spin-off proposal, GLSC stock began trading on a "when issued" basis.

**9.** *See* the discussion at p. 4, *supra.*